18 U.S. 35 (____)
5 Wheat. 35
UNITED STATES
v.
WILTBERGER.
Supreme Court of United States.

February 14th. C.J. Ingersoll, for the United States.
*42 *43 February 18th, 1820. MARSHALL, Ch. J., delivered the opinion of the court.
The indictment in this case is founded on the 12th section of the act, entitled, "an act for the punishment of certain crimes against the United States." That section is in these words: "and be it enacted, that if any seaman, or other person, shall commit manslaughter, on the high seas, or confederate," &c., "such person or persons, so offending, *and being therefore [*94 convicted, shall be imprisoned not exceeding three years, and fined not exceeding one thousand dollars.
The jurisdiction of the court depends on the place in which the fact was committed. Manslaughter is not punishable in the courts of the United States, according to the words which have been cited, unless it be committed on the high seas. Is the place described in the special verdict a part of the high seas? If the words be taken according to the common understanding of mankind, if they be taken in their popular and received sense, the "high seas," if not, in all instances, confined to the ocean which washes a coast, can never extend to a river, about half a mile wide, and in the interior of a country. This extended construction of the words, it has been insisted, is still further opposed, by a comparison of the 12th with the 8th section of the act. In the 8th section, congress has shown its attention to the distinction between the "high seas," and "a river, haven, basin or bay." The well-known rule that this is a penal statute, and is to be construed strictly, is also urged upon us.
On the part of the United States, the jurisdiction of the court is sustained, not so much on the extension of the words "high seas," as on that construction of the whole act, which would engraft the words of the 8th section, descriptive of the place in which murder may be committed, on the 12th section, which describes the place in which manslaughter may be committed. This transfer of the words of one section to the other, is, it has been contended, in pursuance *of the obvious intent of the legislature; [*95 and in support of the authority of the court so to do, certain maxims or rules for the construction of statutes, have been quoted and relied on. It has been said, that although penal laws are to be construed strictly, the intention of the legislature must govern in their construction. That if a case be within the intention, it must be considered as if within the letter of the statute. So, if it be within the reason of the statute. The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle, that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment.
It is said, that notwithstanding this rule, the intention of the law-maker must govern in the construction of penal, as well other statutes. This is true. But this is not a new independent rule, which subverts the old. It is a modification of the ancient maxim, and amounts to this, that though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases, which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend. The intention *44 of the legislature is to be collected from the words they employ. Where *96] there is no ambiguity in *the words, there is no room for construction. The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of words, especially, in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated. If this principle has ever been recognised in expounding criminal law, it has been in cases of considerable irritation, which it would be unsafe to consider as precedents forming a general rule for other cases.
Having premised these general observations, the court will proceed to the examination of the act, in order to determine whether the intention to incorporate the description of place contained in the 8th section, into the 12th, be so apparent as to justify the court in so doing. It is contended, that throughout the act, the description of one section is full, and is necessarily to be carried into all the other sections which relate to place, or to crime. The 1st section defines the crime of treason, and declares, that if any person or persons, owing allegiance to the United States of America, shall levy war," &c., "such person or persons shall be adjudged guilty of treason," &c. The second section defines misprision of treason; and in the *97] description of the *persons who may commit it, omits the words "owing allegiance to the United States," and uses, without limitation, the general terms "any person or persons." Yet, it has been said, these general terms were obviously intended to be limited, and must be limited, by the words "owing allegiance to the United States," which are used in the preceding section.
It is admitted, that the general terms of the 2d section must be so limited; but it is not admitted, that the inference drawn from this circumstance, in favor of incorporating the words of one section of this act into another, is a fair one. Treason is a breach of allegiance, and can be committed by him only who owes allegiance, either perpetual or temporary. The words, therefore, "owing allegiance to the United States," in the first section, are entirely surplus words, which do not, in the slightest degree, affect its sense. The construction would be precisely the same, were they omitted. When, therefore, we give the same construction to the second section, we do not carry those words into it, but construe it as it would be construed independent of the first. There is, too, in a penal statute, a difference between restraining general words, and enlarging particular words.
The crimes of murder and of manslaughter, it has been truly said, are kindred crimes; and there is much reason for supposing, that the legislature intended to make the same provision for the jurisdiction of its courts, as to the place in which either might be committed. In illustration of this position, *98] the 3d and 7th sections of the act have been cited. *The 3d section describes the places in which murder on land may be committed, of which the courts of the United States may take cognisance; and the 7th section describes, in precisely the same terms, the places on land, if manslaughter be committed in which, the offender may be prosecuted in the *45 federal courts. It is true, that so far as respects place, the words of the 3d section concerning murder, are repeated in the 7th, and applied to manslaughter; but this circumstance suggests a very different inference from that which has been drawn from it. When the legislature is about to describe the places in which manslaughter, cognisable in the courts of the United States, may be committed, no reference whatsoever is made to a prior section respecting murder; but the description is as full and ample, as if the prior section had not been in the act. This would rather justify the opinion, that in proceeding to manslaughter, the legislature did not mean to refer us to the section on murder, for a description of the place in which the crime might be committed, but did mean to give us a full description in the section on that subject. So, the 6th section, which punishes those who have knowledge of the commission of murder, or other felony, describes the places on land in which the murder is to be committed, to constitute the crime, with the same minuteness which had been before employed in the 3d, and was, afterwards, employed in the 7th section.
In the 8th section, the legislature takes up the subject *of murder [*99 and other felonies, committed on the water, and is full in the description of place. "If any person or persons, shall commit, upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular state, murder," &c. The 9th section of the act applies to a citizen who shall commit any of the offences described in the 8th section, against the United States, or a citizen thereof, under color of a commission from any foreign prince or state.
It is observable, that this section, in its description of place, omits the words, "in any river, haven, basin or bay," and uses the words "high seas" only. It has been argued, and, we admit, with great force, that in this section, the legislature intended to take from a citizen offending against the United States, under color of a commission from a foreign power, any pretence to protection from that commission; and it is almost impossible to believe, that there could have been a deliberate intention to distinguish between the same offence, committed under color of such commission, on the high seas, and on the waters of a foreign state, or of the United States, out of the jurisdiction of any particular state. This would unquestionably have been the operation of the section, had the words, "on the high seas," been omitted. Yet it would be carrying construction very far, to strike out those words. Their whole effect is to limit the operation which the sentence would have without them; and it is making very free with legislative language, to declare them totally useless, when they are sensible, and are calculated to have a decided *influence on the meaning of the clause. [*100 That case is not directly before us, and we may, perhaps, be relieved from ever deciding it. For the present purpose, it will be sufficient to say, that the determination of that question in the affirmative, would not, we think, be conclusive with respect to that now under consideration. The 9th section refers expressly, so far at least as respects piracy or robbery, to the 8th; and its whole language shows that its sole object is to render a citizen who offends against the United States or their citizens, under color of a foreign commission, punishable in the same degree as if no such commission existed. The clearness with which this intent is manifested by the language of the whole section, might perhaps justify a latitude of construction, which *46 would not be allowable, where the intent is less clearly manifested; where we are to be guided, not so much by the words in which the provision is made, as by our opinion of the reasonableness of making it. But here, too, it cannot escape notice, that the legislature has not referred for a description of the place, to the preceding section, but has inserted a description, and by that insertion, has created the whole difficulty of the case.
The 10th section declares the punishment of accessories before the fact. It enacts, "that every person who shall, either upon the land or the seas, knowingly and wittingly, aid and assist, procure, command, counsel or advise any person or persons to do or commit any murder, or robbery, or other *101] piracy, *aforesaid, upon the seas, which shall affect the life of such persons, shall," &c. Upon this section, also, as on the preceding, it has been argued, that the legislature cannot have intended to exclude from punishment those who shall be accessories before the fact to a murder or robbery, committed "in a river, haven, basin or bay, out of the jurisdiction of any state;" and now, as then, the argument has great weight. But it is again to be observed, that the legislature has not referred, for a description of place, to any previous parts of the law, but has inserted a description, and by so doing, has materially varied the obvious sense of the section, "Every person who shall, either upon the land or the seas, knowingly and wittingly, aid," &c. The probability is, that the legislature designed to punish all persons amenable to their laws, who should, in any place, aid and assist, procure, command, counsel or advise, any person or persons to commit any murder or piracy punishable under the act. And such would have been the operation of the sentence, had the words, "upon the land or the seas" been omitted. But the legislature has chosen to describe the place where the accessorial offence is to be committed, and has not referred to a description contained in any other part of the act. The words are, "upon the land or the seas." The court cannot reject this description. If we might supply the words "river, haven," &c., because they are stated in the 8th section, must we supply "fort, arsenal," &c., which are used in the 3d section, describing the place in which murder may be committed on land?
*102] In doing so, we should *probably defeat the will of the legislature. Yet, if we depart from the description of place, given in the section, in which congress has obviously intended to describe it, for the purpose of annexing to the word "seas," the words "river, haven, basin or bay," found in the 8th section, there would be, at least, some appearance of reason in the argument, which would require us to annex also to the word "land," the words "fort, arsenal," &c., found in the 3d section.
After describing the place in which the "aid, assistance, procurement, command, counsel or advice," must be given, in order to give to the courts of the United States jurisdiction over the offence, the legislature proceeds to describe the crime so to be commanded or procured, and the place in which such crime must be committed. The crime is, "any murder or robbery, or other piracy aforesaid." The place is, "upon the seas." In this section, as in the preceding, had the words "upon the seas" been omitted, the construction would have been that which, according to the argument on the part of the United States, it ought now to be. But these words are sensible and are material. They constitute the description of place which the legislature has chosen to give us; and courts cannot safely vary that *47 description, without some sure guide to direct their way. The observations made on this section apply so precisely to the 11th, that they need not be repeated.
The legal construction of those sections is doubtful, and the court is not now, and may, perhaps, never *be, required to make it. It is sufficient [*103 to say, that should it even be such as the attorney-general contends it ought to be, the reasons in favor of that construction do not apply conclusively to the 12th section. They both contain a direct reference to the 8th section. They describe accessorial offences, which, from their nature, are more intimately connected with the principal offence, than distinct crimes are with each other.
The 12th section takes up the crime of manslaughter, which is not mentioned in the 8th; and without any reference to the 8th, describes the place in which it must be committed, in order to give jurisdiction to the courts of the United States. That place is "on the high seas." There is nothing in this section, which can authorize the court to take jurisdiction of manslaughter committed elsewhere. To prove the connection between this section and the 8th, the attention of the court has been directed to the other offences it recapitulates, which are said to be accessorial to those enumerated in the 8th. They are admitted to be accessorial; but the court draws a different inference from this circumstance. Manslaughter is an independent crime, distinct from murder, and the legislature annexes to the offence, a description of the place in which it must be committed, in order to give the court jurisdiction. The same section then proceeds to enumerate certain other crimes, which are accessorial in their nature, without any description of places. To manslaughter, the principal crime, the right to punish which depends on the place in which it is committed, congress has annexed a description of place. To the other crimes enumerated *in the same [*104 section, which are accessorial in their nature, and some of which, at least, may be committed anywhere, congress has annexed no description of place. The conclusion seems irresistible, that congress has not, in this section, inserted the limitation of place inadvertently; and the distinction which the legislature has taken, must, of course, be respected by the court.
It is the object of the law, among other things, to punish murder and manslaughter, on land, in places within the jurisdiction of the United States; and also to punish murder and manslaughter, committed on the ocean. The two crimes of murder and manslaughter, when committed on land, are described in two distinct sections, as two distinct offences; and the description of place in the one section, is complete in itself, and makes no reference to the description of place in the other. The crimes of murder and manslaughter, when committed on water, are also described as two distinct offences, in two sections, each containing a description of the place in which the offence may be committed, without any reference in the one section to the other. That section which affixes the punishment to manslaughter on the seas, proceeds to describe other offences, which are accessorial in their nature, without any limitation of place. In every section throughout the act, describing a crime, the right to punish which depends on place, and in some instances, where the right of punishment does not depend upon place, the legislature has, without any reference to a preceding section, described the *48 place in which it must be committed, in order to bring the offender within the *105] act. This characteristic feature *of the law now to be expounded deserves great consideration, and affords a powerful reason for restraining the court from annexing to the description contained in one section, parts of the description contained in another. From this review of the examination made of the act at the bar, it appears, that the argument chiefly relied on, to prove that the words of one section descriptive of the place ought to be incorporated into another, is the extreme improbability that congress could have intended to make those differences with respect to place, which their words import. We admit, that it is extremely improbable. But probability is not a guide which a court, in construing a penal statute, can safely take. We can conceive no reason why other crimes, which are not comprehended in this act, should not be punished. But congress has not made them punishable, and this court cannot enlarge the statute.
After giving the subject an attentive consideration, we are unanimously of opinion, that the offence charged in this indictment is not cognisable in the courts of the United States; which opinion is to be certified to the circuit court for the district of Pennsylvania.
CERTIFICATE.  This cause came on to be heard, on the transcript of the record of the circuit court for the district of Pennsylvania, and on the question on which the judges of that court were divided, and was argued by counsel: on consideration whereof, the court is of opinion, that manslaughter *106] in a river, such as the river Tigris is described *to be, is not punishable by the laws of the United States, and that the circuit court of the United States for the district of Pennsylvania, has no jurisdiction over the offence. All which is ordered to be certified to the circuit court of the United States for the district of Pennsylvania.[(a)]
*49 
*50 
*51 
*52 
*53 
NOTES
[(a)] The constitution of the United States declares, that the judicial power of the Union shall extend (among other things) "to all cases of admiralty and maritime jurisdiction;" and this court has determined, that the power thus granted belongs exclusively to the courts of the United States. (Martin v. Hunter, 1 Wheat. 333, 337.) It is not the purpose of this note to consider what cases of a civil nature are properly included within the terms, "cases of admiralty and maritime jurisdiction." As to the criminal jurisdiction of the admiralty, there is no doubt, that it is defined by local limits; and in order to ascertain these, it becomes necessary to inquire into the extent of the admiralty jurisdiction of England, from which ours was derived, as that was from the maritime states on the continent of Europe.

Both in England and the other countries of Europe, the court of admiralty is a branch which has sprung from that ancient and venerable stock, the office of admiral. The etymology of the word serves to indicate the origin of the office, and the time when it was introduced, at least, under that name, into Europe. The word admiral, or ammiral, is doubtless derived from the Arabic word emir or amira, signifying a general officer or commander in chief, dominum vel præfectum. (Du Cange, Glossary, verbo Admiralius.) In the time of the crusades, by means of which so many oriental usages were brought into the west of Europe, it was introduced into France, as the title of a commander-in-chief, either of land or sea forces. Accordingly, we find that the office, with that title, was unknown, until the third race of French kings, under Charles IV., about the end of the thirteenth century, and it appeared in England about the same period, in the reign of Edward I. After the term thus came to be exclusively *107] applied to the commander-in-chief *of naval forces in France, the station was filled with several illustrious characters, and in the scale of civil and military dignities, ranked immediately after the office of constable. The person who filled this high station had jurisdiction, by himself or his deputies, of all crimes and offences committed on the sea, its ports, harbors and shores. (Valin, Com. sur l'Ordon. lib. 1, tit. 2, art. 10, de la Compétence.)
In England, the office subsisted with the same title of high admiral, until the reign of Charles II., when it was filled by his brother, the Duke of York (afterwards James II.), who being excluded from office, as a Catholic, by the test act in 1673, it was executed by commissioners, with the same power and authority as belonged to the Lord High Admiral: and since the accession of the house of Hanover, the office has also been vested in commissioners, who are styled the Lords Commissioners of the Admiralty. But the king is said still to hold, for certain purposes, the office of Lord High Admiral, though in a capacity distinguishable from his regal character; a distinction of practical importance in the law of prize, but immaterial to the present purpose. The judge of the high court of admiralty, in England, formerly held his place by patent from the Lord High Admiral, but since that office has only existed in contemplation of law, he holds it by direct commission from the crown. The ancient criminal jurisdiction of the court was modified by the statute of the 28 Hen. VIII., c. 15, which enacted, that offences upon the seas, and in havens, rivers, &c., should be tried by the admiral or his deputy, and three or four more, among whom two common-law judges are usually appointed, the judge of the high court of admiralty presiding. (2 Bro. Civ. & Adm. Law 458.) In Scotland, the court is held before the delegate of the high admiral, who may also name other inferior local deputies, and who is declared to be the king's justice-general upon the seas, or fresh water, within flood and mark, and in all harbors and creeks. (2 Bro. Civ. & Adm. Law 30.)
This remarkable conformity between the origin, history and nature of the courts of admiralty in France and Great Britain, renders it highly probable, that their jurisdiction, both civil and criminal, however it may have been shifted from its ancient *foundations, was originally the same; and this supposition derives additional [*108 strength from the manner in which the history of the two countries is blended together, during the middle ages, and from the circumstance of both having derived their maritime institutions from the shores of the Mediterranean.
There appears to be no question, that the admiralty jurisdiction of England originally extended to all crimes and offences committed upon the sea, and in all ports, rivers and arms of the sea, so far as the tide ebbs and flows. This is established by the ancient inquisitions, the records of which still remain in the Black Book of the Admiralty, and by the articles given in charge at the admiralty sessions, as early as the reign of Edward III. (Clerke's Praxis, Roughton's Articles, passim; Exton, c. 11-13; Selden, de Dom. Mar., lib 2, c. 24, p. 209.) But Lord COKE, in 4 Inst. 135, et seq., after admitting, that the admiralty had jurisdiction of all things done upon the sea, endeavors to establish the doctrine, that the sea, ex vi termini, did not include any navigable waters, within the body of any county of the realm; and for proof of this, he mainly relies on certain authorities in Fitzherbert's Abridgment (Avowry, 192; Corone, 399), which, when carefully considered, will not support his position. The hostility of Lord COKE to the admiralty, and indeed, to every other jurisdiction rivaling the common-law courts, is well known; and Mr. Justice BULLER has observed, that "with respect to what is said relative to the admiralty jurisdiction, in 4 Inst. 135, that part of Lord COKE'S work has been always received with great caution, and frequently contradicted. He seems to have entertained, not only a jealousy of, but an enmity against, that jurisdiction." All the authorities cited by Lord COKE will be satisfactorily disposed of, upon the supposition (which Lord HALE asserts to be the fact), that before the 35th year of Edward III., the common law exercised, even upon the narrow seas, as well as in ports and havens, within the ebb and flow of the tide, a concurrent jurisdiction with the admiralty. (2 Hale's P.C. 13, et seq.) Neither does the case itself in Fitz. Abr., Corone, 399, 8 Edw. II., warrant Lord COKE'S assertion. STAUNTON J., is there reported to have said, that it is not an arm of the sea, where a man can see *what is done on the [*109 one side of the water and the other; and that the coroner, in such cases, shall exercise his jurisdiction there¹ This dictum, taken literally, cannot be considered as law, for in the Year Books (22 Assis. 93), it is expressly held, that every water which flows and reflows, is called an arm of the sea, so far as it flows. "Que chescun ewe, que flow et reflow es appelle bras de mer cy tantaunt come el flowe." The same doctrine is quoted and confirmed by Lord HALE, who states, that the sea is either that which lies within the body of a county, or without; and that an arm or branch of the sea which lies within the fauces terræ, where a man may reasonably discern between shore and shore, is, or at least may be, within the body of a county. (Hale, de Jure Mar., c. 4, p. 10.) So that there is the strongest reason to question Lord COKE'S authority it this respect, and to adhere to the evidence furnished by the records of the admiralty, of its jurisdiction in ports and havens within the ebb and flow of the tide.
How far this ancient jurisdiction has been altered by statutes, is another question. The statute 13 Richard II., c. 5, enacts, "that the admirals, and their deputies, shall not meddle, henceforth, of anything done within the realm, but only of a thing done upon the sea, according as it hath been duly used in the time of the noble King Edward (III.) grandfather of our Lord the King that now is." The statute 15 Richard II., c. 3, enacts, "that of all manner of contracts, pleas and quereles, and of all other things done, or arising within the bodies of counties, as well by land as by water, and also of wreck of the sea, the admiral's court shall have no manner of cognisance, power nor jurisdiction; but all manner of contracts, pleas and quereles, and all other things rising within the bodies of counties, as well by land as by water, as afore, and also wreck of the sea, shall be tried, determined, discussed and remedied, by the laws of the land, and not before, or by, the admiral, nor his lieutenants, in any wise. Nevertheless, of the death of a man, and of a maihem, done in great ships, being hovering on the main stream of great rivers only, beneath the bridges of the same rivers, nigh to the sea, and in none other places of the same rivers, the admiral shall have cognisance; *110] and also, to *arrest ships in the great flotes, for the great voyages of the king, and of the realm; saving always to the king all manner of forfeitures and profits thereof coming; and he shall also have jurisdiction upon the said flotes, during the said voyages, only saving always to the lords, cities and boroughs, their liberties and franchises." The true limit of the admiralty jurisdiction, under these statutes, was long a subject of angry contention between the civilians and the common lawyers. But it is admitted on all sides, that on the main or high seas (which, as Blackstone states, begin at the low-water mark, 1 Bl. Com. 110), the admiralty has jurisdiction, exclusive of the common law; and that, between high-water mark and low-water mark, where the sea ebbs and flows (which is technically the shore of the sea, or littus maris, Hale, de Jure Mar. c. 4, p. 12), the common law and the admiralty have a divided empire (divisum imperium) or alternate jurisdiction, one upon the water, when it is full sea, the other upon the land, when it is an ebb. (1 Bl. Com. 110; Constable's Case, 5 Co. 106, 107; Barber v. Whanton, 2 Ld. Raym. 1452; 2 East P.C. 803; 4 Bl. Com. 268.) Upon the sea-coast, therefore, it is incontestible, that the body of every county, bordering on such coast, is bounded by the shore of the sea, and at no time extends below low-water mark.
But what constitutes the boundary of counties bordering on arms of the sea, and navigable rivers, is a question concerning which great differences of opinion have been expressed. It has been strenuously insisted by the judges of the admiralty, that notwithstanding the statutes of Richard, the admiralty still continues to possess jurisdiction in all ports, havens and rivers, where the sea ebbs and flows, below the first bridges. (1 Sir L. Jenkins' Life, xcii.; Exton, b. 2, c. 3, et seq.; Zouch 92.) And Sir Henry Spelman adopts the same opinion. (Spelm. Reliq. 226.) The ground of this opinion is, that the same rule exists at the common law, in respect to the bounds of counties on navigable waters and arms of the sea, as is applied by the same law to the sea-coast, viz., that they are limited by the ebb and flow of the tide; and that the statute of Richard was intended *no further to restrict the *111 admiralty, than as to crimes committed above the first bridges. (1 Sir L. Jenkins' Life, xcii.; Exton, c. 10, to 20, Zouch 92.) And it cannot be denied, that the agreement of the twelve judges, in 1632 (cited at large, 3 Wheat. 365 note), strongly countenances this pretension. In Rex v. Soleguard (Andr. 231), also, Sir Edmund Isham cited an opinion, delivered as recently as 1713, on a reference to all the judges, in which ten of them (against Ward, C.B., and Gould, J.) held, "that the admiralty hath a jurisdiction in all great navigable rivers from the bridges to the sea." And in that case, the court did not deny the jurisdiction, but founded their judgment upon a supposed concurrent jurisdiction of the common law. On the other hand, Lord COKE, principally on the authority of the two cases before cited (4 Inst. 140; Fitz. Abr., Avowry, 192, and Corone, 399,) maintains, that the bodies of counties comprehend all navigable waters where persons can see from one side to the other; or rather, as other authorities, with more accuracy, state it, the point, where a man standing on one side of the land, may see what is done on the other side. (Hawk. P.C. c 9, § 14; 2 East P.C. 804.) Lord HALE appears to speak with great doubt and hesitation on this subject, merely asserting that "an arm or branch of the sea, where a man may reasonably discern between shore and shore, is, or, at least, may be, within the body of a county." And it may fairly be inferred, as well from this cautious expression, as from his commentary on the statute of the 28 Hen. VIII., c. 15 (2 Hale's P.C. 16, 17), that Lord HALE was not satisfied with Lord COKE's exposition of the common-law boundary of counties. The whole question, however, became in a great degree unimportant in England, after the enactment of the statute of the 28 Hen. VIII., c. 15, which gave to the high commission court (of which the admiral or his deputy is the presiding judge). cognisance of "all treasons, felonies, robberies, murders and confederacies committed in or upon the sea, or in any other haven, river, creek or place, where the admiral or admirals have, or pretend to have, jurisdiction." In the exposition of this statute, Lord HALE says, "this seems to me to extend to great rivers, where the sea flows and reflows, below *the first bridges, and also, in creeks of the sea, at full water, where the sea [*112 flows and reflows, and upon high water, upon the shore, though these possibly be within the body of the country, for there, at least, by the statute of 15 Rich. II., they (the admirals) have a jurisdiction; and thus, accordingly, it has been held at all times, even when the judges of the common law have been named, and sat in the commission; but we are not to extend the words (pretend to have) to such a pretence as is without any right at all; and therefore, although the admiral pretend to have jurisdiction upon the shore, when the tide is reflowed, yet he hath no cognisance of a felony committed there." 2 Hale, P.C. 16, 17.
This construction of the statute, in opposition to Lord COKE's, was solemnly adopted, in a very recent case, by the twelve judges; and sentence of death accordingly passed upon the prisoner, upon a conviction under the statute. (Rex v. Bruce, 2 Leach's C.C. 1093, 4th Ed., cited at large, 3 Wheat. 371 note.) Sir Leoline Jenkins, in his charge given at the admiralty sessions, at the Old Bailey, speaking of the commission given to the judges under the statute, says: "But the commission itself explains the word (pretend) in a more particular manner, in directing the inquiry to be of things done, not only upon the sea, and in havens, creeks and rivers, as in the statute, but also in all places whatsover, within the flowing of the water, to the full sea-mark; and in all great rivers, from those bridges downwards that are next the sea: which words, being in the commission, are the best comment upon the statute, it having so often passed the great seal, in these last seven score years, under the view and approbation of so many lords chancellors and keepers, and of so many attorney-generals, men of the greatest eminency in the laws of the land, so that the words of the statute, and the commission, being taken together, do not only ascertain the power of this court to hear and determine offences done in all, or any, of those places, but do also declare all, and every, of the places themselves, to be within the jurisdiction of the admiralty; for otherwise, the jurisdiction of the commissioners, since the statute, would be of larger extent, and in more places than the jurisdiction of the admiral was before the statute, *113 *which it is clear, was not intended by the law-makers." (1 Sir L. Jenkins, xci.) But where such havens, creeks and rivers, &c., are within the body of a county, it seems now generally agreed, that the courts of common law have a concurrent jurisdiction over the same offences. (2 Hale's P.C. 15, 16; Rex v. Bruce, 2 Leach's C.C. 1093, 4th ed.)
Supposing, however, Lord COKE's view of this matter to be correct, the limits of a county will still be confined to places in rivers, creeks and arms of the sea which are so narrow as that a person on one side can reasonably discern and attest upon oath anything done on the other side; for the reason assigned for this rule of limitation is, that the pais may there come and take inquisition of the facts. (4 Inst. 140; 2 East's P.C. 804.) And in England, the admiralty hath, by the express provisions of the statute 15 Rich. II., c. 3, cognisance of every description of homicide and mayhem, "happening in great ships being and hovering in the main stream of great rivers, below the bridges of the same rivers, which (as Blackstone observes) are then a sort of port or haven; such (to use his own illustration) as are the ports of London and Gloucester, though they lie at a great distance from the sea (4 Bl. Com. 268), and though they be within the body of a county. (2 Hale's P.C. 16.)
But it is certainly very questionable, how far the statutes of Richard II. are to be considered as restrictive of the grant of admiralty and maritime jurisdiction, contained in the constitution of the United States. These states were never designed to apply to the colonies, for, at that time, the colonies did not exist; and in point of fact, the admiralty jurisdiction in the colonies has always depended entirely upon the royal commission, and upon acts of parliament expressly extending to them. Hence, the colonial vice-admiralty courts have constantly exercised jurisdiction in many cases, such as revenue cases, of which the high court of admiralty, in England, has not recently taken jurisdiction. I say, recently, because, it seems, that formerly, the admiralty, in England, did take jurisdiction of the breaches of the navigation laws, and other laws of trade; either by the express provisions of those statutes, or in virtue of its original *114] *maritime jurisdiction. (1 Sir L. Jenkins' Life, lxxii., xcv. et seq.; 2 Sir L. Jenkins, p. 745, 746.) But it appears, that the colonial vice-admiralty courts have uniformly exercised a jurisdiction over revenue cases, upon their original inherent powers, by virtue of their commissions, independent of any statute. (See a case cited in The Fabius, 6 Rob. 245.) Besides, the restrictions contained in the statutes of 13 and 15 Rich. II., as to criminal jurisdiction, are purely arbitrary, and cannot be considered as declaratory of the pre-existing law. What reason is there, why the admiralty should have jurisdiction of homicide and mayhem, in rivers, ports and creeks of the sea, and not of other crimes in the same places? Such a limitation has no foundation in the ancient constitution of the court, and never, at any time, existed, independent of the statute. It is also a well-established rule in the construction of English statutes, that they are not to be considered as extending to the colonies, unless included by express words, or by inevitable implication (1 Bl. Com. 107, 108); and it cannot be pretended, that the colonies are within the purview of the words of the statutes of the 13 and 15 Richard II. Why, then, should they be considered as extending to the colonies, which did not then exist, any more than to Scotland, which was not then united to the crown, but in which country the admiralty still retains its ancient jurisdiction undiminished?
The commissions issued by the crown to the vice-admiralty courts in the colonies, were entirely inconsistent with the limitations imposed upon the admiralty, in England. One of the latest, which is probably copied from the others, is that issued to the governor of New Hampshire, in 6 George III. It empowers him "to take cognisance of, and proceed in, all causes, civil and maritime, and in complaints, contracts, offences or suspected offences, crimes, pleas, debts, exchanges, accounts, charter-parties, agreements, suits, trespasses, inquiries, extortions and demands, and all business, civil and maritime, whatsoever, &c., throughout all and every the sea-shores, public streams, ports, fresh waters, rivers, creeks and arms, as well as of the sea, as of the rivers and coasts, whatsoever, of the province, &c., and territories dependent thereon, and maritime ports, whatsoever, of the same, and thereto adjacent;" and in this commission *115 *those places are *115 referred to as within "our maritime jurisdiction." (De Lovio v. Boit, 2 Gallis. 470, note 47.) It seems highly probable, that the expression "maritime jurisdiction," in the constitution, was borrowed from the language of those commissions, and was introduced ex abundanti cautelâ, and superadded to the term "admiralty," in order to obviate any doubt as to the full extent of the authority meant to be conferred.
Indeed, it has already been, in effect, decided by this court, that the statutes of Richard are not in force in the United States, as limitations of the admiralty and maritime jurisdiction granted in the constitution. By the judiciary act of 1789, c. 20, § 9, seizures under laws of impost, navigation and trade, on waters navigable from the sea by vessels of ten or more tons burden, as well as seizures on the high seas, are expressly included in the admiralty and maritime jurisdiction of the district courts. It is evident, that congress could not give the district courts, acting as courts of admiralty, cognisance of any causes which were not "of admiralty and maritime jurisdiction," within the true meaning of the constitution; because, it would deprive the parties of their constitutional right of trial by jury. The objection was, therefore, very early taken, that seizures in ports, and in such navigable waters, as above stated, were not causes of admiralty and maritime jurisdiction, because those places were not, according to the common-law interpretation in England of the statutes of Richard II., within the jurisdiction of the admiralty. But this court has repeatedly overruled the objection (La Vengeance, 3 Dall. 297; The Sally, 2 Cranch 406; The Betsey and Charlotte, 4 Id. 443; The Samuel, 1 Wheat. 9; The Octavia, Id. 20), and thereby established the doctrine, that the constitutional admiralty jurisdiction includes ports, arms and creeks of the sea, as far as the tide ebbs and flows.
The learned reader will observe, that this position is not disturbed by the decision of this court in the case in the text (United States v. Wiltberger), nor by that of the United States v. Bevans (3 Wheat. 336, 387), the only question in those cases being, not what was the constitutional authority of congress, but how far it had been exercised; not what was the *extent of the admiralty and maritime jurisdiction [*116 granted in the constitution, but how far it had been conferred by congress upon any particular court of the Union.
¹ United States v. Grush, 5 Mason 290; United States v. Davis, 2 N.Y. Leg. Obs. 35.]