Mr. Justice WOODBURY.
I concur in the conclusion of my brethren as to the judgment which ought to be pronounced in all of the three license cases.
But, differing in some of the reasons for that judgment, and in the limitations and extent of some of the principles involved, and knowing the cases to possess much interest in the Circuit to which I belong, and from which they all come, I do riot feel at liberty to refrain from briefly expressing my views upon them.
The paramount question involved in all the cases is, whether license laws by the States for selling spirituous liquors are constitutional. It is true that several' other points are raised, as to evidence, the power of juries in criminal prosecutions to decide the law as well as the facts, and other questions not connected with the overruling of any clause in an act of Congress, or treaty, or the constitution, which was interposed in the defence. But, confined as we are to these last considerations in writs of error to State courts, it would be travelling out of our prescribed path to discuss at all either the other questions just alluded to, or some which have been long and ardently agitated in connection with this subject; such, for instance, as the expediency of the license laws, or the power of a State to regulate in any way the food and drink or clothing of its inhabitants. Fortunately, those questions belong to another and more appropriate forum, — the State tribunals.
Brit, looking to • the relations which, exist between the general government and the different State sovereignties, the question, whether the laws in these, cases are within the power of the States to passj without an encroachment on the authority, of the general government, is one of those conflicts of laws between the two gov-’ emments, involving the true extent of the powers in each as regards the other., which is very properly pláced under our revision. In helping to discharge that duty on this occasion, I carry with me, as a controlling principle, the proposition,, that State powers, State rights, and State decisions are to be upheld when the .objection to them is not clear, equally proper as it may be for them, when the objection is clear, to give way to the supremacy of the authorized measures of the general government. See Constitution, art. 3.
It is not enough to fancy some remote or indirect repugnance to acts of Congress, — a “ potentiál inconvenience,” — in order to annul the laws of sovereign States, and overturn the deliberate decisions of State tribunals. There must be' an actual collision, a direct inconsistency, and that deprecated case of “ clashing sover- *619 eignties,” in order to demand the judicial interference of this court to reconcile them, McCulloch v. Maryland, 4 Wheat. 316, 487 ; 1 Story’s' Com. on Const. 432.
These cases present two leading facts in respect to the material points, which ought first to be noticed. Neither of them is a prosecution against the importer of spirit or wine from a foreign country ; and in neither has a duty been imposed, or a- tax collected by the State from the original defendant, in connection with these articles. From this state of things, it follows, that, however much has been said as to the collision between these license laws and'some former decisions of this court, no such direct issue is made up in either of them.
The case usually cited in support of such a proposition is very different. It is that of Brown v. Maryland, 12 Wheat. 419, which was a tax or license required, before the sale of an article, from the importer of it from a foreign country ; and it was an importer alone who called the constitutionality of the law in question. What do these statutes, then, really seek to do ? They merely attempt to regulate the sale of spirit or wine within the limits of States, in regard to the quantity sold at any one time without a license from the State authorities, — as in the cases from Massachusetts and Rhode Island ; and' in regard to any sale whatever without such license,. — as in the case from New Hampshire.
It is true, also, that the quantity allowed to be sold in Massachusetts at any one time,1 without a license, is not so small as that which is permitted by C ngress to be imported in kegs, and.in Rhode Island is greater than that which Congress permits to be imported in bottle?, and in New Hampshire is no, quantity whatever. Yet neither of the laws unconditionally prohibits importations. Indeed, neither of them says any thing on the subject of importations. ‘ The first inquiry, then recurs, whether they do not all stand on the same platform in respect to this, and without conflicting in this respect with any act of Congress. My opinion is that they do ; as none of them, by .prohibiting importations, oppose in terms any act of Congress which, allows them, and none seem to me to conflict, in substance more than form, with entire freedom on that subject. Nor in either case do they, in point of fact,'amount to a prohibition of importations in any quantity, however small. Under them, arid so far as regards them, importations still go on abundantly into each of .those States. It is manifest, also, whether as an abstract proposition or practical measure, that a prohibition to import is one thing, whilé a prohibition to sell without license is another and entirely different. , The first would operate on foreign commerce, on the voyage. The latter affects only the internal business of the State after the foreign importation is completed and on shore. In the .next place,, in point of fact, neither of the laws goes so far as to prohibit in terms the .sales, any more than the imports, of spirits. *620 On looking at the laws, this will be coneeded. But if such a prohibition existed as to sales, what act of Congress would it come in collision with ? None has ever been passed which professes to regulate or permit sales within the States as a matter of commerce. A good reason exists for this, as the subject of buying and selling within a State is one as exclusively belonging to the power of the Staté over its internal trade, as that to regulate foreign commerce is with the general government, under the broadest construction of that power.
And what power or measure of the general government would a prohibition of sales within a State conflict with, if it consisted merely in regulations of the police or internal commerce of the State itself ? There is no contract, express or implied, in any act of Congress, that, the owners of propérty, whether importers or purchasers from them, shall sell their articles in such quantities or at such times as they please within the respective States. Nor can they expect to sell on any other' or better terms than are allowed by each State to all its citizens, or in a manner different from what has comported with the policy of most of the old States, as well before as since the constitution was adopted. Any other view would not accord with the usages of the country, or the fitness of things, or the • unquestioned powers of all sovereign States, and, as is admitted, even of those in this Union, to regulate both their internal commerce and general police. The idea, too, that a prohibition to sell would be tantamount to a prohibition to import, does not seem to me either logical or founded in fact. For, even under a prohibition to sell, a person could import, as he often does, for his own consumption and that'of his 'family and plantations ; and, also, if ; merchant, extensively engaged in commerce, often does import articles with no view of selling them here, but of storing them for a higher and more suitable market in another State, or abroad. This was the paramount object in the law of Congress, so often cited, as to the importation of kegs of fifteen gallons of brandy, — to have them in proper shape to be reexported and carried on mules in Mexico, rather than to be sold for use here.
I should question the correctness of this objection even were it tire doctrine in Brown v. Maryland, though I do not regard it as the point there settled, or the substantial reason for it. See Chief Justice Parker’s Opinion in The State of New Hampshire v. Peirce, in Law Rep. for September, 1845. That point related rather to the want of power in a State to lay a duty on imports.
But it is earnestly urged, that, as these acts indirectly prohibit sales, such a prohibition of sales is indirectly a prohibition of importations, and importations are certainly regulated by Congress. It is necessary to scrutinize the grounds on which such circuitous reasoning and analogy rest. The sale of spirit being still permitted in all these States, as before remarked, it is first objected, that it is *621 permitted in certain quantities only, except under license, and that this restricts and .lessens both the sales and imports. ■ But the leading object of the license is to insure the sales of spirit in quantities not likely to encourage intemperance, and at places and times, and by persons, conducive to the same end. This is the case in New Hampshire, where none can be sold without license, while in the two other States, if no license is granted, the owner may sell in ten or twenty-eight gallons at a time ; and in all the three States, the own-, er may, without license, consume what he imports, or store and reexport it for a market elsewhere. So the laws of most of the States forbid sales of property on the Sabbath. But who ever regarded that as prohibiting there entirely either their imports or sales ?
It is further ■ argued, however, that the license laws'accomplish indirectly what is hostile to the policy of Congress, and thus conflict with the spirit of its acts, as much as if they prohibited absolutely both importations and sales. But if effecting this at all, it must be because they tend to lessen, and are designed to lessen, the consumption of foreign spirits, and thus help to reduce the imports and sales of them.
The case.from New Hampshire is in this respect less open to objection than the others, the spirit there having been domestic. But as it came in coastwise from another State, it may involve a like principle in another view ; and in its prohibitory character as to selling any liquor without license, the New Hampshire statute goes farther than either of the others.
Now,’ can it be maintained that every law which tends to diminish the consumption of any foreign or domestic article is unconstitutional, or violates acts of Congress ? For that is the essence of this point. So far from this, whatever promotes economy in the use or consumption of any articles is certainly desirable, and to be encouraged by both the State and general governments. Improvements of that kind by new inventions and labor-saving machinery are encouraged by patents and rewards. More especially is it sound policy everywhere to lessen • the consumption of luxuries, and in particular those dangerous to public morals. So in respect to foreign articles, the disuse of them is promoted by both the general and State governments in several other ways, rather than treating it as unconstitutional or against the acts of Congress,' though the revenue as well as consumption be thereby diminished. Thus, the former orders the- purchase of only domestic hemp for the navy, when it can be obtained of a suitable quality and price (Resolution, 18 February, 1843, 5 Statutes at Large, G48). And some of the States have often bestowed bounties on the growth of hemp, and of wheat, and other useful articles. An exception like this would cut so deep and wide into other-'usages and policy well established, as to need iio further refutation.' But this objection is *622 mixed up with another, — that the operation of these license laws is unconstitutional, because they ‘lessen the amount of revenue which the general government might otherwise derive from the importation of that which is made abroad. It may be a sufficient reply to this, that Congress itself, by its own revenue system, has.at times, by very high duties on some articles, meant to diminish their consumption, and reduce the revenue which otherwise might be derived from them if allowed to be introduced more largely under a.small dutjr. And in this very article of spirits it has confessedly, from' the foundation of the government, made the duties high, so as to discourage their use ; and this in the very, last tariff of 1846, though considered to be more emphatically, a mere revenue measure. So its actual policy for fifteen years has been to lessen the use of spirit in both the army and navy and by the third section of the act of Aug. 29th, 1842, ch. 267 (5 Statutes at Large, 346), this .policy is recognized and encouraged by law.
So, wheh resorting to internal duties, for a like reason in part, stills and the manufacture of whiskey have been the first resorted tOj and at last, in order to discourage the making of molasses into ■New England rum, the drawback on the former when manufactured into spirit and exported is allowed to stand now on a footing much less favorable than that on sugar when refined and exported.
Again, where States look to the most proper objects of domestic taxation, it is perfectly competent for them to assess a higher tax or excise, byway of license or direct assessment, on articles of foreign rather than domestic growth belonging to her citizens ; and it ever has been done, however it may discourage the use of the former, or lessen the revenue which might otherwise be derived from them by the general government, or tend to. reduce imports, as well as restrict the sale of them when considered of a dangerous character.
The ground is, therefore,' untenable entirely, that a'course of legislation which serves to discourage what is foreign, whether it be by Congress or-the States, is for that reason alone contrary to the constitution, even if it tend at the same time to reduce the amount of revenue which would otherwise accrue from foreign ihtports, or from those of that particular article. .
Importations, then, being left unforbidden in all of these cases, and the right to sell with a license’ not being prohibited in any of them, — nór without one prohibited, except qualifiedly in two of them, and in the other aDsolutely, but not affecting foreign imports at all in that case, as the spirit sold there was of domestic manufacture, — I pass to the next' constitutional objection.
It has been contended, that the .sum required to be paid for a license, and the penalty imposed for selling without' one, are in the nature- of. a duty on imports, and thus come within the principle really settled in Brown v. Maryland, and thus conflict with the. constitution. It is conceded, that a State is forbidden “ to lay any im-' *623 post or duties on imports ” without the assent of Congress. (Art. T, § 10.) But neither of these statutes purports to tax imports from abroad of foreign spirits, or imports from another State, either coastwise or by land, of either foreign or domestic spirits. The last mode is not believed to be that referred to in the constitution, and no regulation has ever been made by Congress concerning it when consisting of domestic spirits, as in the case of New Hampshire,, except with a view to prevent smuggling. Act of Congress, Sept. 1, 1789, ch. 11, § 25, and Feb. 18,1793, ch. 8, § 14 ; 1 Statutes at Large, 61, 309.
Nor does either of these statutes purport to tax the introduction of an article by the merchant importing it, much less to impose any duty on the article itself for revenue, in addition to what Congress requires. Neither of them appears to be, in character, or design, a fiscal measure; They do not' touch the merchandise till it has become a part of the property and capital of the State, and then merely regulate the disposal of it under license, as an affair of police and internal commerce. They might then even tax it as a part of the commercial stock in trade, and thus subject it, like other property, to a property tax, without being exposed to be considered an ■impost on imports, so ¿s to conflict with the constitution. But the penalty and license in these cases are imposed diverso intuitu, and not as a tax of any kind. Hence they opérate no more in substance than in form, as an impost of the prohibited character.
There is no pretence that the penalty is for revenue ; and if the small sum taken for a license should ever exceed the expense and trouble of supervising the matter, and become a species..of internal duty or pxeise, it would operate- on spirit made in the State as well as that made elsewhere, and on others as well as importers, and, like any State tax on local property, or local trade, or local business, be free from any conflict with the constitution or acts of Congress. And what seems decisive in these causes as to this aspect of the question is, that neither of the persons here prosecuted was m fact an importer of foreign spirit or' wines, or set up a defence of that kind as to himself,, on the trial, which was overruled in the State courts.
Nor can the proposition, sometimes advanced, be vindicated, that this license, if a tax, and falling at times on persons not citizens, whether they belong to other States or are aliens, is either unjust or unconstitutional. _ It falls on them only when within the limits of the State, under the- protection of its laws and seeking the privileges of its trade, and only in .common with their own citizens. Such taxes are justifiable on principles of international law (Vattel, B. 8, ch. 10, § 132), and I can find.no clause in the constitution with which they come in collision.
Again; it has been' strenuously insisted on in these cases, and perhaps it is the leading position, that these license laws are virtually *624 regulations of foreign commerce ; and hence, when passed by a State, are exercising a power exclusively vested in the geneial government, and therefore void. This is maintained, whether they actually conflict with any particular act of Congress or not. But, dissenting from any such definition of that power, as thus exclusive and thus abrogating every measure of a State which by construction may be deemed á regulation of foreign commerce,' though not at all conflicting with any existing act of Congress, or with any thing ever likely to be done by Congress, I shall not, on this occasion, go at length into the reasons for my dissent to the exclusive character of this power, because these license laws are not, in my opinion, regulations of foreign commerce, and in a recent inquiry on the circuit I have gone very fully into the question. The United States v. New Bedford Bridge, in Massachusetts District.
My reasons aré in brief, —
1. The grant is in the same article of the constitution, and in like language, with others whit h this court has pronounced not to be exclusive, e. g. the regulation- of weights and measures, of bankruptcy, and disciplining the militia.
2. There is nothing in its nature, in several respects, to render it more exclusive than the other grants, but, on the contrary, much in its nature to permit and require the concurrent and auxiliary action of the States. But I admit, that, so far as regards the uniformity of a regulation reaching to all the States, it must in these.cases, of course, be exclusive ; no State being able to prescribe rules for others as to bankruptcy, or weights and measures, or the militia, or for foreign commerce. A want of attention to this discrimination has. caused most of the difficulty. But there is much in connection with foreign commerce which is local within each State, convenient for its regulation and useful to the public, to be acted on by each till the power is abused or some course is taken by Congress con.flicting with it. Such are the deposit of ballast in harbours, the extension of wharves into tide-water, the supervision of the anchorage of ships, the removal of obstructions, the allowance of bridges with suitable draws, and various other matters that need not be enumerated, beside the exercise of numerous police and health powers, which are also by many claimed upon different grounds.
This local, territorial, and detailed legislation should vary in different States, and is better understood by each than by the general government ; ♦ and heneé, as the colonies under an empire usually attend to all such local legislation within their limits, leaving only general outlines and rules to the parent country at home, as to.wns, cities, and’ corporations do it through by-laws for themselves, after the State legislature lays down general principles, and as the war and navy departments and courts of justice make- detailed rules under general laws, so here the States,. not conflicting with any uniform and general regulations by Congress as to foreign com *625 merce, must for convenience, if not necessity, from the very nature of the power, not be debarred from any legislation of a local and detailed character on matters connected with that commerce omitted by Congress. And to hold the power of Congress as to such topics exclusive, in every respect, and prohibitory to the States, though never exercised by Congress,, as fully as when in actiye operation, which is the opposite theory, would create infinite inconvenience, and detract much from the cordial cooperation and consequent harmony between both governments, in their appropriate spheres. It would nullify numerous useful laws and regulations in all the Atlantic and commercial States in the Union.
If this view of the subject conflicts with opinions laid down obiter in some of the decisions made by this court (9 Wheat. 209 ; 12 ibid. 438 ; 16 Peters, 543), it corresponds with the conclusions of several judges on this point, and does not, in my understanding of die- subject, contradict any adjudged case in point. 5 Wheat. 49 ; Willson v. Blackbird Creek Marsh Company, 2 Peters, 245 ; 11 ibid. 132 ; 14 ibid. 579 ; 16 ibid. 627, 664 ; 4 Wheat. 196.
But, without going farther into this question, it is enough here to say, that these license laws do not profess to be, nor do they operate as, regulations of foreign commerce. They neither direct how it shall be carried on, nor where, nor under what duties or penalties. Nothing is touched by them which is on shipboard, or-between ship and’ shore ; nothing till within the limits of a State, and out of the possession and jurisdiction of the general government’.
It is objected, in another view, that such licenses for selling domestic spirit may affect the commerce in it between the. States, which by the constitution is placed under the regulation of Congress as much as foreign commerce.
But this license is a regulation neither- of domestic commerce between the States, nor pf foreign commerce. It does not operate on either, or the imports of either, till they have entered the State and become component párts of its property. Then it has by .the constitution the exclusive power to regulate its own internal'commerce and business in such articles, and bind all residents, citizens or not, by its regulations, if they ask its protection and privileges ;. and Congress, instead of being opposed and thwarted by regulations as to this, can no more interfere in it than the States can interfere in regulation of foreign commerce.- If the proposition was maintainable, that,- without any legislation by Congress as to the trade, between the States (except that in coasting, as before explained, to prevent smuggling), any thing imported from another State, foreign or domestic, could be sold of right in the package in which it was imported, not subject to any license or internal regulation of a State, then it is obvious that the whole license system may be evaded and nullified, either from abroad, or from a neighbouring’ State. ’ And the more especially can it be done from the latter, as *626 ilnports may be made in bottles of any size, down to half a pint, of spirits or wines ; and if its sale cannot be interfered with and regu-. lated, the retail business can' be carried on in ■ any small quantity, and by the most irresponsible and unsuitable, persons, with perfect •impunity.
The apprehension that the States, by these license systems, are likely to impair the freedom of trade between each other, is hardly verified by the. experience of a half-century. Their conduct has been so liberal and just thus far on this matter as never to have called for the.legislation of Congress, which it clearly has the power to make in respect to the commerce between the States, whenever any occasion shall require its interposition to check imprudences or abuses on the part of any one of them towards the .citizens- of another. Some have objected, next, that these laws violate our foreign treaties, such as those, for example, with Great- Britain and Prussia, which stipulate for free ingress and egress as to our ports, as well as for a participation in our interior trade. See 8 Statutes at Large, 116, 228, 378. But those arrangements do not profess 'to exempt their people from local taxation here, or local conformity to license systems, operating, as.th.ese State laws dp, on their own citizens and their own domestic products in the same way, and . to the-same extent, as on foreign ones. And neither of those laws in .this- case forbid access to our ports, or importation into the several' ' States, by the inhabitants of any foreign countries.
In settling the question whether these laws impugn treaties, or regulate either foreign commerce or that between the States, or impose a duty on imports, ordinary justice to the' States demands that they be presumed to have meant what .they profess till the contrary is shown. Hence, as these laws were passed by.States possessing experience, intelligence, and a high tone of morals, it is neither legal nor liberal to attempt to nullify them by any forced construction, so as to make them regulations of foreign commerce, or measures to collect revenue by a duty on foreign imports, thus imparting to them a character different from that professed by their authors, or from that which, by their provisions and tendency, they appear designed for. \ These States are as incapable of duplicity or fraud in their laws, of meaning one thing-and professing another, as the purest among their accusers ; and while legitimate and constitutional objects are assigned, and means used which seem, adapted to such ends, it is illiberal to impute other designs, and to construe their legislation as of a sinister character, which they never- contemplated. Thus, on the face pf them, these laws- relate exclusively to the regulation of licensed houses and the sales of an-article which, especially where retailed in .Small quantities, is likely to attract together within the State unusual numbers, and encourage idleness, wastefulness, and drunkenness. .To mitigate, if not prevent, this last evil .was undoubtedly théir real design.
*627 ■ From the first settlement of this country, and in most other nations, ancient or modern, civilized or savage, it has been found useful to discountenance excessps in the use of intoxicating liquor. And without entering here into the question whether legislation may not, on this as other matters, become at times intemperate, and react injuriously to the salutary objects sought to, be promoted, it is enough to say, under the general aspect of it, that the legislation here is neither novel nor extraordinary, nor apparently designed to promote other objects than'physical, social, and moral improve-' ment.' On the contrary, its tendency clearly is to reduce family expenditures, secure health, lessen pauperism and crime, and cooperate with, rather than counteract, the apparent policy of the general government itself in respect to the disuse of ardent spirit.
They aim, then, at a right object. They are calculated to promote it. They are adapted to no other. And no other, or sinister, or improper view can, therefore, either with delicacy or truth, be imputed to them.
But I go further on this point than some of the court, and wish to meet the case in front,'and in its worst bearings. If, as in the view of some, these license laws were really in the nature of partial or entire prohibitions to sell certain articles within the limits of a State, as being dangerous to public health and morals, or were virtual taxes on them as State property in a fair ratio with other taxation, it does not seem to me that their conflict with the constitution would, by any means, be clear. "Taking for granted, -till the contrary appears, that the real design in passing them for such purposes is the avowed one, and' especially while their provisions are suited to effect the professed object, and nothing beyond that, and do not apply to persons or things, except where within the limits of State territory, they wouldvappear entirely defensible as a matter of right, though prohibiting sales.
Whether such laws of the States as to licenses are to be classed as police measures, or as regulations of their internal commerce, or as taxation merely, imposed on local property and local business, and are to be justified by each or by all of them together, is of little consequence, if they are laws which from their nature and object must belong to all sovereign states.-- Call them by whatever name, if they aré necessary to the well-being and independence of all communities, they remain among the reserved rights of the States,' no express grant of them to the general- government having been either proper, or apparently embraced in the constitution. So, whether they conflict or not indirectly and slightly with some regulations of foreign commerce, after the subject-matter of that commerce touches the soil of waters within the limits of a State, is not perhaps very máterial, if they do not-really relate to that commerce, dr any other topic within the jurisdiction of the general government.
*628 As a general rule, the power of a State over all matters not granted away must be as full in the bays, ports, and harbours within her territory, intra fauces terra, as on her wharves and shores, or interior soil. And there can be little check on such, legislation, beyond the discretion of each State, if we consider the great conservative reserved powers of the States, in their quarantine or health- systems, in the regulation of their internal commerce, in their authority over taxation, and, in short, every local measure necessary to protect themselves, against persons or things dangerous to their peace and their morals.
It is conceded that the States may exclude pestilence, either to the body or -mind, shut out the plague or cholera, and, no less, obscene paintings, lottery tickets, .and convicts. Holmes v. Jennison et al., 14 Peters, 568; 9 Wheat. 203; 11 Peters, 133. Ho.w can they be sovereign within their - respective spheres, without power to regulate all their .internal commerce, as well as police, and. direct -how, when, and where it shall be conducted in articles intimately connected either with public morals, or public safety, or the ■public prosperity ? See Vattel, B. 1, ch. 19, §§ 219, 231.
The list of interdicted articles and persons is a long one in most European governments, and, though in some cases not very judicious or liberal, is in others most commendable ; and the exclusion of opium from China is an instance well known in Asia, and kindred in its policy. The introduction and storage of - gunpowder in ■large quantities is one of those articles long regulated and forbidden here. New York v. Miln, 11 Peters, 102. Lottery tickets and indecent prints are also a common subject of prohibition almost everywhere. 6 Greenleaf, 412 ; 4 Blackford, 107. See the tariff of 1842 ; 5 Stat. at Large, 566, § 28,. .And'why not cards, dice, and other instruments for gaming,- when thought necessary to suppress that vice ? In short, on what principle but this rests the justification of the States to prohibit gaming itself, wagers, cham-perty, forestalling, — not to speak of the debatable cases of usury, marriage- brokage bonds, and many other matters deemed either impolitic or criminal ?
It might not comport with the usages or laws of nations to. impose mere transit duties on articles or men passing through a State, and however resorted to in some places and on some occasions, it is usually illiberal, as well as injudicious. Vattel, B. 8, ch. 10. And if resorted to here, in respect to the business or imports of citizens of other States, might clearly conflict with some provisions of the constitution conferring on them equal, rights, and be a regulation of the commerce between the States, the power over which they have expressly granted to the general government. But the present case is not of that character. Nor would it be, if prohibiting sales within the acknowledged' limits of a State, in cases affecting public morals or public- health. Nor is there in this case *629 any complaint, either by a foreign merchant or foreign nation, that treaties are broken ; .or by, any of our own States of by Congress, that its acts or the constitution have been violated.
There are additional illustrations of'such powers, existing on general principles in all independent states, given in Puffendorf, B. 8, ch. 5, § .30, as well as in various other writers on national law. And, those exercised under 'what he terms “ sovereign or transcendental propriety ”’(§ 7th), and those which we class under the right of “ eminent domain,” are recognized in the fifth .amendment to the constitution itself, and go far beyond this.
Much more is there an authority to forbid sales, where an authority exists both to seize and destroy the article itself, as is often the case at quarantine.
So the power to-forbid the sale of things is surely as extensive, and rests on as broad principles of public security and sound morals, as. that' to exclude persons. And yet who does not know that slaves have been prohibited admittance by many of our States, whether coming from their neighbours or abroad ? And which of them cannot forbid their soil from being polluted by incendiaries and felons from any quarter ?
' Nor is there in my view any power conferred on the general government which has a right to control this matter of internal commerce or police, while it is fairly exercised so as to accomplish a legitimate object, and by means adapted legally and suitably to such end alone. New Hampshire has, for many years, made it penal to bring'into her limits paupers even, from other States ; and this is. believed to be a power exercised widely in Europe among independent nations, as well as in this country among the States. New Hampshire Revised Statutes, Paupers, 140.
It is the Undoubted and reserved power of every State here, as a political body, to decide, independent of any provisions made by Congress, though subject not to conflict with any of them when rightful, wBo.shall compose its population, who become its residents, who its-'citizens, who enjoy the privileges of its laws, and be entitled- to their protection and favor, and what kind of property and business it will, tolerate and protect. And no one government, or its agents or navigators, possess any right to make another State, against its consent, a penitentiary, or hospital, or poor-house farm for its wretched outcasts, or a receptacle for' its poisons to health, and instruments of gambling and debauchery.- Indeed, this' court has deliberately said, — “We entertain no doubt whatsoever, that .the States, in virtue of their general police power, possess full jurisdiction to arrest and restrain runaway slaves, and remove them from their borders, and- otherwise to secure themselves against their depredations and evil example, as they'certainly may do in cases of idlers, vagabonds, and paupers.” Prigg v. Pennsylvania, 16 Peters, 625.
*630 There may be some doubt whether the' general government or each State possesses the prohibitory power, as to persons or property of certain kinds, from coming into the limits of the State. But it must exist'somewhere ; and it seems to me rather a police power, belonging to the States, and to be exercised in the manner best suited to the tastes' and institutions of each, than one anywhere granted or proper to the peculiar duties of the general government. Or, if vested in the latter at all, it is but concurrent. Hence., when the latter prohibited the import of obscene prints in the tariff cf 1842, it was a novelty, and was considered by some more properly to be left to the States, as it opened the door to a prohibition, or to prohibitory duties,-to many articles by the general government which some States might desire, but others not wish to come, in as competitors to their own manufactures. But, as previously shown, to prohibit sales is not the same power, nominally or in substance, as to prohibit imports.
It is possible, that, under our system.of double governments over one arid the same people, the States cannot prohibit the mere arrival of vessels and cargoes which they may deeiri dangerous, in character to their public peace, or public morals, or general; health. This might, perhaps, trench on foreign commerce.. Nor can they tax them as imports. This might trench pn that part of the constitution which forbids States to lay duties on imports. ' But after articles have come within the territorial limits of States, whether on land or water, the destruction- itself of what contains disease and death, and the longer-continuance of such articles within their limits, or the. terms and conditions of their continuance^ when conflicting with their legitimate police, or with their power oyer internal commerce, or with their right of taxation over all persons and property under their protection , and jurisdiction, seems one of the first principles of State .sovereignty,- and indispensable to public safety. Such extraordinary powers, I concede, are to be exercised with-caution, and only when necessary or clearly justifiable in. emergencies, on sound and constitutional principles ; and, if used too often, or indiscreetly, would open a door to inuch abuse. But the powers seem clearly to exist in the States, and ought to remain there;. and though, in this instance, they are not used to this extent, but still, as respectable minorities within these three States believe -not tó be useful, and-as some other States do not think deserving imitation, yet they are used as the competent, and. constitutional power within each has judged to be proper for its own welfare, and as does not appear to be repugnant to any part of the constitution, or a treaty, or an act of Congress. They must, therefore, not be interfere^’ with by this court, and the more especially as one reason why these powers have been left with the States isj that the subject-matter of them is better understood by each State than by the Union ; and'the policy and opinions and usages of one *631 State in relation to some of them maybe very unlike those -of others, <¡nd therefore require a different system of legislation. Where can such a power, also be safer lodged than with those, .public bodies, or' States, who are themselves to he the greatest' sufferers in interest and character by an improper use of it ?• If.it should happen at any time to be exercised injudiciously, that circumstance would furnish a ground for an appeal rather to the intelli- . gence and prudence of the State, in respect to its modification or ■epeal, than an authority for this court, by a writ of error, to-interfere with tile well-considered decision of a State court, and. reverse it, and pronounce, a State law null and void, merely on that account.
' Many State laws are such, that their expediency and justice may be doubted widely, and by this tribunal; but this confers no authority on us to nullify them ; nor is any such authority, for sucha causé, conferred on Congress by any part of the constitution.
The States stand properly on their reserved rights, within their own powers and sovereignty, to judge of the expediency and wisdom of their own laws.; and while they take care not to violate clearly any portion of the constitution or - statutes • of the' general government, our duty to that constitution and laws," and our respect for State rights,.must require us.not to interfere.