Parker, J.
This was an action of debt, brought in the superiour court of Wythe county on a judgment of the circuit court of the district of Columbia. In its progress the defendants (who are the plaintiffs in error here) offered two pleas which were rejected by the court. One was the plea of nil debet: the other that the judg *630 ment of the circuit court was recovered on a bill of exchange drawn by their testator, when he was in a state 0f intoxication, for money won at gaming.
The counsel for the defendant in error, in an able ancj eJat>oi-ate argument, has attempted to justify the court below in rejecting both pleas, by contending that the judgments of the courts of the district of Columbia ■are not foreign judgments, but must be regarded, in a Virginia court, as upon the footing of judgments of •courts of récord in our sister states, and therefore conclusive upon the parties, according to the doctrine settled in the case of Clarke’s adm’r v. Day, 2 Leigh 172. In support of this proposition he referred, with more or less confidence, to several clauses in the constitution of the United States. Among them he noticed the third section of the fourth article, which gives to congress “ power to dispose of, and make all needful rules and regulations respecting, the territory or other property belonging to the United Statesand seemed to think that the power to prescribe the effect of judgments was an incident to the power of making needful rules and regulations. To this it may be answered that this clause does not apply to the states or to the district of Columbia, but obviously refers to the lands within the territories, of which congress may dispose. Otherwise we should convict the framers of the constitution, of the folly of giving congress, in one clause, exclusive jurisdiction over the district, and in another the power to make all needful rules and regulations respecting it. But if it were so, the power to make needful rules and regulations for its own territories, and to dispose of them, would no more authorize congress to prescribe the effect of judgments therein obtained, within the states of this union, than the power possessed by England or France to make laws for the government of its own dominions, can confer authority to extend the effect of its legislation to this country.
*631 The counsel also referred to the first section of the fourth article of the constitution, and the acts of 1790 and 1804, made, as he contends, in pursuance thereof. The section is in these words : “Full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state. And the congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof.” By the act of 1790, the mode of authentication was prescribed, and it was declared that records and judicial proceedings so authenticated should have full faith and credit given to them in every court within the United Stales. By the force of these latter words, the supreme court decided in Mills v. Duryee, 7 Cranch 481. that the judgment of a state court was conclusive as to its effect in the district of Columbia, because congress had a clear right to establish rules of evidence for its own courts in its own territories. But as to states, I feel assured that this section could not give congress the right to prescribe the effect of any other judgments &c. therein, than those of other states; for the same court had decided in the case of Hepburn &c. v. Ellzey, 2 Cranch 452. that under an analogous article of the constitution applying to states, the ten miles square was not a state within its meaning.
. It is supposed that the act of 1804 (to be found in Story’s edition of the laws of the United States, vol. 2. p. 947.) is an attempt to prescribe the effect of judgments &c. of the courts of the respective territories of the United States, and countries subject to their jurisdiction, within the several states; and that it has made them conclusive. I do not give this interpretation to the law, but believe it was only designed to declare the effect of judicial proceedings, records, public acts &c. of states and territories, within the other territories of the United States, or countries subject to the jurisdiction of the Uni *632 ted States, in their own courts; and I am inclined to this opinion, because no attempt, that I am aware of, has ever been made to apply it to a state court, and because, if the law was meant to prescribe a rule of evi¿61106 for the state courts, it would be clearly unconstitutional. I have already considered the import of the first section of the fourth article of the constitution, as confined to states; and we shall look in vain for the power to prescribe the effect of such public acts, records and judicial proceedings, in other clauses of the constitution.
The clause most relied on as conferring on congress the power in question, and as making this a domestic judgment, is that authorizing it “ to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of government of the United States.”
We know from the 43rd number of the Federalist, written by mr. Madison, why this power was conferred. It was because “ without it, not only the public authority might be insulted and its proceedings be interrupted with impunity, but a dependence of the members of the general government on the stale comprehending the seat of the government, for protection in the exercise of their duty, might bring on the national councils an imputation of awe or influence, equally dishonourable to the government, and dissatisfactory to the other members of the confederacy.” It is difficult to conceive how a clause introduced for such purposes can be held to confer substantive powers, not otherwise granted under the constitution. If that be so, the limitations upon the power of congress, and the rights reserved to the states, are idle and illusory. Congress has, in spite of them, found a place for its lever, whereby it may control the movements of the states. It has nothing to do, according to this argument, but to exer *633 cise a power clearly constitutional within the district, and in order to make it effectual, and because it may be a convenient incident to the power exerted, to extend its operation to the states ; and in this way it becomes therein constitutional. Thus it may establish a lottery in the district, and authorize a sale of its tickets in th.e states, contrary to their penal'laws : or it may establish a bank there, and in aid of this corporation, extend its branches into every state of the union; which, for the sake of the argument, I assume it has no constitutional right to do under its general powers. Is it possible that such a construction can be given to this grant of powers, limited to the ten miles square ? And if we yield to this construction, where are the rights reserved to the states ? It cannot be denied that the states retain the sovereign powers vested in them before the formation of the constitution, except so far as they are granted to the government of the United States, and such sovereignty is not to be impaired in favour of the United States, unless it be clearly within the reach of their constitutional charter. These propositions are affirmed by the supreme court itself, in Martin v. Hunter’s lessee, 1 Wheat. 325. and Houston v. Moore, 5 Wheat. 48. The power to prescribe rules of evidence for their own courts is one originally belonging to the state governments, and cannot be impaired unless' by a law of congress passed in the execution of a federal power coextensive with the union. But a law passed in execution of municipal legislation over a district of limited territory cannot be a part of the supreme law of the land. It is certainly true, however, that there may be acts of legislation passed by congress in virtue of its general legislative powers over the union, which, although local in their immediate operation, are binding upon the states. Such are the acts for constructing a navy yard, and erecting a capitol and other public buildings, within the district. But they are passed, under its authority to *634 legislate for the union, just as the power to build forts, arsenals or lighthouses is exercised.; and they must be limited as to their objects, by the powers expressly conferred by the constitution, or necessary and proper to carry them into execution. Their constitutionality may be tested by the simple enquiry, whether, if the clause conferring exclusive legislation over the district had not been found in the instrument, congress could pass the laws ? If not, it is in vain to invoke the aid of the clause conferring the power to legislate in all cases for the ten miles square. If it could be invoked with effect, the government of the United States would possess the same exclusive power to legislate “ in all cases whatsoever” over the states, that it has over the district.
There is nothing in the decision of the supreme court in the case of Cohens v. Virginia, 6 Wheat. 264. impugning these opinions. The court in that case decided that the act of congress did not purport to authorize the corporation of Washington to force the sale of their lottery tickets in the state of Virginia, where such sales were forbidden. But no opinion was given whether, if it had, the law would have been constitutional. Notwithstanding some general extrajudicial expressions used in that case, leading perhaps to a contrary inference, I cannot believe the court would have so decided. If it had however, whatever respect I am disposed to pay to so high an authority, it would not have controlled my judgment in a case I consider so plain.
Passing by the express provisions of the constitution, the counsel next contended that as the circuit court of the district of Columbia is a branch of the federal judiciary, its judgment must be regarded as a domestic judgment. The case of Pepoon v. Jenkins, 2 Johns. Cas. 119. cited in support of this proposition, has, so far as I perceive, no application to it. In that case the record of the judgment of the circuit court of the United States for the district of Massachusetts was not authenticated *635 according to the act of congress of 3790. The court decided that as it was authenticated according to the ordinary mode used in Massachusetts, and as this was the record of a court of the United States, and not of a state court, it was not within the act of congress, and might i)c offered in evidence. Its effect as evidence was not the question before the court; and if it had been, there may be a difference between the effect of a judgment of one of the federal courts established in the several states, in execution of a power coextensive with the United States, even in the state courts proper, and of that of a court of the district of Columbia.* With that question I do not mean to embarrass myself, it not being necessary here to decide it. But in respect to the judgments of the courts of the district, they can in no sense be said to bo domestic to ours. Those courts arc federal tribunals established as municipal courts for the district, administering laws different from our own, having no power to enforce their judgments here, and united to us by no common ligaments, except that the same legislature which makes laws for the one “ in all cases whatsoever,” may, in certain cases allowed by the constitution, make laws for the other. The decisions of the english courts respecting irish and scotch judgments before and since the union (see Otway v. Ramsay, 2 Strange 1090, and Harris v. Saunders, 4 Barn. & Cres. 411. and others cited by the president) emphatically apply to the relations existing between the district of Columbia and the states, and shew that this ground of argument has no foundation. The state of *636 Virginia and the district are foreign to each other, and ° , so are their judgments.
Considering this judgment, then, as a foreign one, ought the pleas which were offered to have been rejected r If the court rendering it is a foreign court, not judicially known by us to be a court of record; if it is a court established by and amenable to a sovereign foreign, as to that matter, to the state of Virginia, it would seem to follow that nil debet may be pleaded, or there is no general issue in the case; for the plea of nul tiel record is plainly inapplicable to a foreign judgment. There are defences which may be made to foreign judgments without trenching upon any rule of sound policy; such as a want of jurisdiction, or that the defendant had no notice of the suit, or that the judgment was obtained by fraud or founded in mistake, or was irregular and void by the local law; and there ought to be some general issue to let in these defences, without driving the defendant to a special plea. Therefore I think the plea of nil debet ought to have been received. But I do not think the defendant hafe the right to go behind the judgment, to retry its merits and set up a defence which has been or might have been relied on in the original case, or which has been waived, as in this case; and therefore I am of opjinion that the second plea was properly rejected. ■
There has been some fluctuation of opinion in the english and american courts, upjon the subject of the degree of respect which ought to be paid to foreign judgments. Sometimes it has been held that they were not even prima facie evidence, the plaintiff being bound to prove his original demand, and the defendant being at liberty to go at large into the merits, as if no court had passed upoon them. 2 Kent’s Com. 118. et seq. where the cases are collected. At other times it has been held that the judgment is pii-ma, facie evidence of the debt or demand, and conclusive until impeached by the other *637 party as unjust, or shewn to be irregularly or unduly obtained. Sinclair v. .Fraser, in the house of lords, reported in a note to Walker v. Witter, 1 Doug. 4. and cited by Buller, J. in Galbraith, v. Neville, also reported • in a note in 1 Doug. 6. a. From the remarks of justice Buller it would seem that the doctrine maintained in these cases was, that the foreign judgment should have the same force as the judgments of a domestic court not of record. At length, however, an english court, in the case of Martin v. Nicolls, 3 Simons’s Rep. 458. has decided that a foreign judgment is conclusive evidence, and not reexaminadle; and the vice chancellor states this to be the true result of the old cases.
On the other hand, in the american state courts, the unbroken current of decision has been that foreign judgments, as contradistinguished from the judgments of the courts of a sister state, are not conclusive; and in general the defendant has been permitted to make the same defence to any action brought upon them, as he might have done to the original suit. That they were not conclusive, seems to have been taken for granted by the framers of the constitution, or the clause giving to congress the power to declare their effect would probably not have been inserted. But that a point once decided between the same parties should be regarded as a mere nullity, seems to be contrary to every principle of sound policy, and to the comity due to foreign states; whilst it would certainly be productive of much inconvenience and injustice, from the loss of evidence by accident or the lapse of time. It is these considerations, in the absence of uniform and authoritative decisions, which induce me to approve the judgment of the court below rejecting the second plea, and to reverse it for rejecting the plea of nil debet.
Brockenbrough, J.
The first question which I shall examine is, whether the plea of nil debci is a demurra *638 ble plea to an action of debt brought in Virginia on a judgment of the district of Columbia ?
The constitution of the United States declares that “ full faith and credit shall be given in each state to the act3) records and judicial proceedings of every other state. And the congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof.” And congress, by the act of 1790, declared that they “ shall have such faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the state from whence the said records are or shall be taken.” 1 Story’s Laws U. S. p. 93. The construction of the constitution and of the act is well ascertained by the decisions, not only of the supreme court of the United States in Mills v. Duryee, 7 Cranch 481, and Hampton v. M'Connel, 3 Wheat. 234. bu,t of this court in Buford v. Buford, 4 Munf. 241. and Clarke's adm'r v. Day, 2 Leigh 172. In the case in Cranch, the court say, “ The act declares that the record, duly authenticated, shall have such faith and credit as it has in the state court from whence it is taken. If in such court it has the faith and credit of evidence of the highest nature, viz. record evidence, it must have the same faith and credit in every other court. Congress have therefore declared the effect of the record, by declaring what faith and credit shall be given to it.” The court further say that in the record of the judgment sued on in that case, the defendant had full notice of the suit, and that in New York, the state from whence it came, it was conclusive upon the parties, and therefore was conclusive in the court of the district of Columbia, where the suit was brought. The court further say that if the judgment had been sued on in any other court of New York, nil debet would have been an inadmissible plea, for a record conclusive between the parties can only be denied by a plea of nul *639 tiel record, and when congress gave the effect of a record to the judgment, it gave till the collateral consequences : it might therefore be proved under the plea of nul tiel record, in the maimer prescribed by the act, and such proof is of as high a nature as an inspection by the court of its own record, or as an exemplification would bo in any other court of the same state. The case in 3 Wheaton is merely a confirmation of the other. I will here remark, that according to the language used by the court in Mills v. Duryee, the judgment could not be conclusive on the parties in the state where it was rendered, unless the defendant had full notice of the suit: a special plea therefore in the court of another state, averring that the defendant had no notice of the suit, as appeared by the record, would be a good bar to the action. And there can be no doubt that a plea alleging that the judgment was obtained by fraud, would be admissible.
In Buford v. Buford, this court, a few months after the decision of Mills v. Duryee, and probably without knowing of its existence, admitted the records of two judgments obtained in Kentucky, as conclusive evidence between the parties in the suit here, for the purpose of proving what they were calculated to prove; taking care, however, not to prohibit evidence on the part of the defendant, shewing that they were fraudulently or collusively obtained. That was not an action upon the judgments; but Clarke’s adm’r v. Day was an action of debt in this state upon a Kentucky- judgment, and the construction given by the supreme court of the United States to the clause of the constitution and the act of congress under consideration, was entirely approved and adopted. J udge Coalter, who spoke for the court, said, that but for the provision in the constitution and act of congress, a judgment in the state of Kentucky, sued on in this state, would not be in the nature of a domestic judgment: it would bo a suit on a foreign judg *640 ment: but that, by virtue of those provisions, a judgment of one state in the union.is to be considered in the nature of a domestic judgment in every other state, the tribunals of which are to allow to it the same force an(j ejg}caCy which it has in the state where it is pronounced. He further said, that be could not see “ under what form of pleading, this matter of law, that is, the efficacy of this judgment as matter of evidence, can be tried as a matter of fact by a jury. The plea of nil debet will not try it. That assumes the matter in dispute, that the judgment is not conclusive; and if issue was taken on that plea, the plaintiff would waive the conclusive effect of his judgment. This he can only assert by a demurrer to the plea.” The judgment of the whole court was that nil debet was an inadmissible plea.
But the constitution and the act of congress apply only to the acts, records and judicial proceedings of the several states of the union, parties to the federal compact, and do not declare how those of any district, territory or country, other than the states, shall be authenticated, nor what shall be the effect of them. The district of Columbia, although a distinct political society, and therefore a state in one sense, is not a state within the meaning of the constitution. Hepburn & Dundas v. Ellzey, 2 Cranch 445. Even the several states of the union, though confederated, yet retain their individual sovereignties, and with respect to their municipal laws are to each other foreign. , Per Pendleton, P. 2 Wash. Rep. 298. The judgments, then, of the courts of that district are, as to the several states of the union, foreign judgments, and must be treated as such.
But we are told that the supplementary act of congress of March 1804 (2 Story’s Laws U. S. p. 948.) makes those judgments domestic judgments, to the same extent that the judgments of the state courts are such. The second section of that act seems to me to counte *641 nance that idea. It declares that the provisions of the act of 1790 shall apply as well to the records and judicial proceedings of the respective territories of the • ' United States, and countries subject to the jurisdiction of the United States, as to the records and judicial proceediugs of the several states. If the meaning of this section merely was, that the judgments of the state courts should be treated in the courts of the territories &c. in the same way as judgments of state courts are treated in other state courts, then the section was unnecessary, because the act of 1790 provided that the records and judicial proceedings of the states should, have the faith and credit thereby imparted to them, “ in every court within the United States; and the supreme court, in Mills v. JDuryee, so understood it. I infer that it was the intention of congress, in the above recited act of 1804, not only to make the judgments of the state courts conclusive in the courts of the territories &c. but the judgments of the courts of the territories &c. conclusive in the courts of the states. If may be supposed, however, that the said section does not extend to the judgments of the district of Columbia, because that district is not named. The district of Columbia is emphatically “a country subject to the jurisdiction of the United States,” and thus comes within the description of the section. If this be so, then the question is whether such a law is authorized by the constitution ? I think not. It certainly is not authorized by the 1st section of the fourth article, already quoted, because that exclusively relates to the records and judicial proceedings of the states. Without that article, congress could not have established such a rule of evidence for the states; and wdth it, I do not perceive how they can require the state courts to receive and treat the judgments of the district of Columbia, or of the territories, as domestic and not as foreign judgments. They may give such a rule to the courts of the district of Columbia, *642 because they mav exercise exclusive legislation over it; " „ ... but the converse or the proposition is not true.
I cannot see any clause of the constitution, by which . ^ ^ this power is conferred on congress. That body has p0wer t0 exercise exclusive legislation in all cases whatever, over the ten miles square; but this'power cannot extend to a general legislation for the states. It has also power to make all laws which shall be necessary and proper for carrying into execution the granted powers, and all other powers vested by the constitution in the government, or in any department thereof. If the courts of the district of Columbia are to be deemed a portion of the departments of the government of the United States, it does not follow that it is necessary and proper to give to their judgments the effect of domestic judgments in the several states of the union. Those judgments are foreign to the states, and it is not for congress to prescribe the mode in which they shall be treated in the states, to which they are foreign. If congress could pass such a law, they would be giving a rule of evidence for the state courts, in violation of their laws; they would be legislating in that particular, not for the ten miles square, but for the several states of the union. I do not admit that under any law which congress has passed or can pass, a judgment of the circuit court of the United States for the district of Maryland, or North Carolina, can be any other than a foreign judgment in the state courts' of this commonwealth. Much less can a judgment of the circuit court of Columbia be so treated.
The judgment, then, in this case was a foreign judgment, and the circuit court erred in rejecting the plea of nil debet.
The next question arises on the second plea, which was also rejected by the court. This plea avers that the bill of exchange on which the judgment was rendered, was given for money unlawfully won at gaming, *643 and whilst the drawer was in a state of intoxication. It brings on the question how far a judgment of a foreign court is examinable when sued on in our courts. I have looked into the decisions in England, from Walker v. Witter, 1 Doug. 1. to Martin v. Nicolls, 3 Sim. 458. 5 Cond. Eng. Ch. Rep. 198. If such judgments are conchisive, according to the last mentioned case, then they cannot be impeached except for fraud, or unless it appear from the face of the record that the defendant had no notice of the suit. On the other hand, if they are only prima facie evidence, then the question is how far are they examinable ? Can the defendant open all the evidence and merits of the cause- anew, and thus retry a cause which has once been fairly tried, though in a foreign tribunal, and in which the defendant had a fall opportunity of defending himself? This course cannot be justified, nor is it supported by the weight of authorities. I will not undertake to say how far a foreign judgment may be impeached by the defendant. A rule as to the extent of this impeachment is laid down by judge Story in his Conflict of Laws, p. 507. which is very sensible, and is perhaps the best that can be adopted. I shall content myself with saying, that it cannot be allowed to a defendant to open the whole merits of the case. When Draper was sued in the circuit court of the district of Columbia on this bill of exchange, he had the opportunity of pleading that it was given for money won at unlawful gaming, or for money won from him unfairly whilst he was in a state of intoxication ; or any other good plea in bar. Not having-availed himself of that opportunity before a court having jurisdiction of the cause, I see no reason why that privilege should be extended to him a second time. The special plea was therefore properly rejected. But, for the first mentioned error, the judgment should be reversed, and the cause remanded for another trial.
*644 Tucker, P.
The interesting questions in this case are for the first time, I believe, presented for the consideration of this court. We are called upon to decide whether the judgments of the circuit court of the distrjct 0p Columbia are to be treated in our courts as foreign judgments, or as having the force and effect of the judgments of our sister states; and if they are to be considered as foreign judgments, how far are they examinable. The result of my enquiries on this subject will shew that in either aspect the effect of the judgment will be very nearly the same; and the question is therefore only interesting because it involves constitutional doctrines of the greatest importance. I am of opinion that the judgments of the court of the district are in our courts to be treated as foreign judgments. This opinion is dictated by no want of respect to that tribunal; by no disposition to relax any one of the many bonds which bind the states together, nor to look upon any portion of the people of this cherished confederacy as alien to ourselves. It rests upon principles of public law, unconnected with matter of feeling, as is abundantly evident from the cases to which the principle has been applied, both in England and America. With the same sovereign, the same legislature, and the same judicial head, the courts of England, Ireland, Scotland, the East and West Indies, and the remotest islands in the british dominions, are, in relation to the judgments in those courts respectively, foreign to each other. Doug. 1. 6. 3 Bing. 353. 4 Bing. 670. 4 Barn. & Cres. 411. 1 Barn. & Adolph. 450. 2 Id. 951. The judgment of the king’s bench is treated by an irish court as a foreign judgment, and the Icing's bench itself affirms the judgment so treating it. Otway v. Ramsay, 2 Str. 1090. 14 Vin. Abr. 569. more, fully reported in a note to Harris v. Saunders, 4 Barn. & Cres. 411. So with us it has been more than once declared, that however bound together by political bonds and common in *645 terest, the states of the union are still, in some regards, . . foreign to each other. 1 hey are so in respect to their municipal laws (2 Wash. 282.) and have been so treated by die federal courts, in drawing the distinction between domestic and foreign bills of exchange (4 Wash. C. C. Rep. 154.): and though, by the 1st section of the 4th article of the constitution of the United Slates, the judgments of each state have the same force in every other, which they have in the state where they are rendered, yet in every other regard the judicial systems are foreign to each other. I cannot think, then, that we violate cither the comity which is due to our brethren of the same confederacy, or to the respectable tribunals presiding over other jurisdictions, by treating their judgments as foreign judgments. The question is a sheer question of constitutional law, and is to be so discussed.
What then constitutes a foreign jurisdiction ? I answer, that tribunals administering different laws, and different systems of jurisprudence, without a common head or a common sovereign, are, ex necessitate, foreign to each other. Such would be the condition of the states to every intent, if they were not bound together by the constitution ; and such is even now their condition, except where the constitution makes it otherwise. But even with a common sovereign, a common legislature and a common judicial head, judicatures may be foreign to each other; as in the instances already given of England, Ireland and Scotland. In reference to them, we find their ablest men testing the validity of the judgments of one of those kingdoms in the other, by the simplest facts. Lord Hardwicke assigns as the reason of his opinion, that the judgment of one does not bind lands in the other; that the judgments of one. cannot be enforced in the other; that the process of one cannot run into the other ; that the records of the one were not matters of which the other was bound to take notice ; and that if considered as records, they must have *646 the effect of records and take precedence of simple contract debts, involving executors in devastavils from ignorance of their existence. And even since the union, chief justice Abbott says of an irish judgment, “If it jg tQ consi¿[ere(j as a judgment in this country, it must have all the consequences of a record; it must therefore bind lands, and rank as a specialty debt in the distribution of personal assets.” Wherefore he treats it as a foreign judgment. There is much reason in these decisions. Jurisdictions which cannot enforce their judgments within each other, and whose judgments have not the effect of domestic judgments in their lien upon the property or person, may well be considered as foreign to each other. But if this judgment be reasonable in relation to jurisdictions all forming members of the same system, having the same sovereign, the same legislature and the same court of error, — moving, in short, harmoniously around the same centre, — what shall we say of our four and twenty-states, each having its own peculiar centre, each having-different systems of laws, different systems of jurisprudence, different legislatures, different supreme courts of error and different sovereignties ? Such judicatures must be foreign to each other: and accordingly it is admitted that except so far as the question is affected by the 4th article of the constitution of the United States, the state courts are so.
But for the expression of the contrary opinion by the respectable judge of the circuit court of the United States for the district of Pennsylvania, in Montford v. Hunt, 1 Wash. C. C. Rep. 28. (which I do not pretend to controvert) I should incline to consider the judgments of one federal circuit court foreign to another. All of these circuit courts, indeed, administer the laws of the United States in the several states ; but they administer also the laws of each state, and follow the systems of judicature of each in their respective districts; pursuing *647 their practice and deferring to their decisions, binding lands by their judgments, and issuing process to every part of their jurisdiction, without the smallest pretension of power to act upon the people or the territory of another state. And in the execution of these duties, some are engaged in untangling the complicated system of land laws, altogether peculiar to one state; some look for the lights of legal science to the common law, while others draw their principles from the fountain of the Institutes, or the pages of the Code Civile. How much more foreign to each other are such tribunals than those of England and Ireland, the laws of which must be more and more approximating, from the possession of a common legislature : and if they are foreign to each other, these might be so considered also.
Be this as it may; it must at least be obvious, that the circuit court of New Yorlc cannot be considered as a domestic court in our state tribunals. Admitting that the judgments of the circuit court of Virginia are domestic and should be so treated, there are reasons for it which, if not altogether satisfactory, are entitled to much consideration. That court administers Virginia law, in controversies between man and man ; it follows Virginia practice, it defers to Virginia decisions, it decides facts by a Virginia jury, its judgments bind Virginia lands, its process pervades the state, and its executions attach both the property and persons of our people. These are strong considerations; but the commune vinculum is wanting; the sovereigns are different, and the jurisdictions, upon principle, ought to be regarded as alien to each other.
I am not aware that these questions have been any where touched. It may however, I imagine, be confidently affirmed that the judgment of the state court of Virginia has never been held to be a domestic judgment in the circuit court of any other state; and if it would not be so held, it can scarcely be pretended that *648 the judgment of the circuit court of another state is a ... . . . domestic judgment in this.
J should not have ventured upon these delicate grounds, but for the argument, that the circuit court of ¿[jS£rjct. js a federal court, and as such domestic to the states.* In truth, however, it is no federal court. It is a municipal court, while the federal courts are national. Gentlemen have said, the district is in no sense a state, because it has no legislature, no voice in the public councils, no political rights. Neither have the russians, but none deny to Russia the character of a sovereignty. Though the district has no peculiar legislature, congress is its legislature, and the confederacij is its sovereign. The powers of that sovereignty are exercised indeed by the president and congress under the constitution. But though they constitute also the federal government, the powers they exercise over the district are not federal and national: they are altogether municipal. Hence it is that the powers of congress over that district are unlimited, as well as exclusive; for in their federative character they can exercise only limited powers. Hence too the jurisdiction of its court is without limit other than that imposed by congress, while that of the federal courts is limited by the constitution. Hence it has cognizance of causes even between citizens of the same state, on all contracts, which the federal courts have not. Hence too, in pleading,. its jurisdiction need not be set forth, while that of a federal court must be shewn. How is it, then, if it be part of the federal judiciary, that it has cognizance of cases to which the power of the federal judiciary does not extend ? How is it that it can hold a plea of debt between two citizens of Virginia, who meet in the district, when the federal judicial power extends to no such case? It is precisely because it is no federal court.
*649 The counsel for the defendant in error has deferred to the decision of the supreme court in Hepburn & Dundas v. Ellzey, 2 Cranch 445. in which it is declared . . . . that tho district is not a state, within the meaning of the constitution ; and has properl} conceded that it does not fall within the 1st section of the 4th article of the constitution, as to the force and effect of the records and judicial proceedings of the states. But it is contended that the act. of 1S04 has placed the judgments of the district, and of every territory of the United States, upon the footing of state judgments under the act of 1.790. My brother Parker has offered very cogent reasons for the opinion that the term “ territory” was not designed to include the district. In this I incline to think he is right; but I am not satisfied that the broad language of the statute can be so narrowed as to confine its operation to the legitimate object of making the judgments of the respective territories evidence in each other. I feel compelled to consider it as declaring that judgments in the several territories shall stand on the same ground with judgments of the several states in respect to the act of 1790. In so far as it has done this, I deem it unconstitutional and void.
To sustain this act, it has been said that congress has exclusive legislation over the district of Columbia., and with it the right to enact all laws necessary to make its legislation effectual; and hence it is deduced, that congress had power to pass the act of 1804, in order to give force and effect to judgments rendered within the district.
Though congress has the right of exclusive legislation over the district (and unlimited, except so far as contrary to reason, or to certain constitutional principles which are universal in their operation) yet its powers, as the sovereign of the ien miles square, extend not one foot within the limits of the states. However needful and convenient it may be, to make its *650 judgments conclusive, and binding on lands in the ^ # ° states, and to authorize its courts to issue process of execut,'on through the states, its powers in these respects are limited necessarily by the antagonizing powers of other sovereignties; and it would be not more absurd for Virginia to declare that her process should issue to Pennsylvania, than is this assumption of power for congress, when exercising municipal powers over the district.
The argument upon this point rests upon the doctrine of implied powers, the existence of which, when confined within due limits, I shall be the last to controvert. If I understand the argument, it is this. — There are certain unquestioned powers of the federal government over their'territories, forts, dock yards, arsenals &c. which cannot be made effectual without extending the legislative action beyond the limits of the particular jurisdiction; and certain cases have been put, for the purpose of illustrating and enforcing this position. These, I humbly conceive, have been most plainly misconceived. Thus it is asked, “If the power of legislation for the particular territory does not extend beyond its limits, wdiat is to be done where a murder is committed within a fort ? It is punishable by act of congress ; but there is no tribunal within the fort for the trial of the culprit. How can he be conveyed through the territories of a state to the proper court, without a law of congress to authorize it, and to punish a rescue, if such should be effected ? How can he be executed elsew'here than in the fort itself? How' can his body be conveyed (for the purpose of dissection) through a country under the jurisdiction of another sovereign, and the individual be punished who within that jurisdiction shall rescue the body ?” Cohens v. Virginia, 6 Wheat. 424. The answer, I think, is easy. Congress having established no judicial forum w'ithin the fort, and having provided that offences compaitted there shall be tried in the *651 circuit court within whoso iurisciiction tho fort is, all ° , laws which are passed for effecting this purpose are several laws, both national and federative in their character. They are incident to the exercise ot the federative judicial power in the circuit court, for the trial of an offender against the laws. They are not municipal laws of the fori, for the fort is no mvnicipium. Ho civil authority or jurisdiction of a municipal character is created there. It is still within the scope of federal authority, until -a distinct civil government is erected within it; and offences within it are therefore tried before a tribunal purely federative. But the district of Columbia is a nnmicipium. The laws relating to it are municipal. Offences are tried by its own municipal court, and not by a federative tribunal. Hence no such laws could be enacted in relation to it. Ho law can pass giving authority to seize the culprit within the limits of a state, or to hang him beyond the coniines of the district. The argument then is without weight, as the analogy totally fails.
It is not my purpose here to go into an enquiry as to the extent and the limitations of implied powers. It is obvious that, there must be some limit arising out of antagonizing rights of tho states. However convenient and useful certain implied powers may be, however necessary they may seem to the express power, they cannot be proper, if they trample upon the rights of tho states, and break in upon those sacred attributes of sovereignty which the framers of the constitution never designed to annihilate. But these topics are foreign to our subject, since the question we are discussing depends on other considerations.
Tho argument, we must, remember, is, that to render the laws of the district effectual, congress must have power to extend the legislative action for the district beyond the limits of the particular jurisdiction. This is to say, in other words, that congress may legislate for *652 the states. If, for instance, congress can make the iudgmerits oí the courts ot the district conclusive in the states, is not this legislating for the states, and not for the . ° ° ... district? Whom does such a provision oblige, — whom does it act upon ? It acts upon our courts, not upon theirs. It is then sheer legislation for the states; and this without any power in the constitution. Recognize this power, and what shall hinder congress from declaring that district judgments shall bind lands in the states, and that district executions may seize the body or goods of the debtor in the remotest state of the union ? Upon the principles contended for, I see no barrier to such provisions. Every vestige of state authority must yield to so pervading a power. For it must be recollected that the powers of legislation over the district are unlimited as to the subjects of legislation ; and if the legislative action may be extended, in every case, beyond the district, it is obvious that congress can legislate in all cases whatever for the states, when by any ingenious process they can connect their legitimate subject of legislation with that which they desire to arrogate. It cannot be imagined, that in the erection of this territory for the convenience and security of congress while engaged in the discharge of their important duties, the framers of the constitution could ever have looked to such a consequence. It is impossible they could have designed that congress should have power to legislate in all cases for the district, and to extend, in its discretion, all the district laws to the states; for this would have been to break down the barriers they had so carefully erected in other parts of the instrument.
Upon a fair examination of the constitution, indeed, we cannot fail to be struck with the distinction between the limitations upon the power of congress when legislating for the union, and when legislating for the district. There were only two modes of limitation which presented themselves; one was territorial, the other *653 respected the subjects of legislation. When legislating - , . . , , ° ® lor the union, it was necessary that the power should be coextensive with the union. It did not admit of territorial limit. To prevent its being unbounded, then, the limitation was necessarily placed upon the subjects of legislation. But in the district it was' otherwise. There it was designed that the power of congress should be supreme. It was necessary tbaL it should be so, to effectuate the very object of the creation of this separate territory. The subjects of legislation within the district were therefore left without limitation, and to prevent the power being unbounded, the limitation imposed was territorial. Thus it is that federal power acts throughout the union, but over limited subjects; while the district legislation acts on every subject, but in a limited territory. Such I take to be the true view of these limitations of power; and if it be correct, the district legislation of congress must be confined to the ten miles square, and neither the implied nor the express powers can be extraterritorial in their operation.
With these views, I entertain no doubt that if the act of 1S04 is to be construed as giving validity to district judgments in the courts of the states, it is unconslitutional and void. And if, as my brother Parker thinks, it does not do so, then the argument drawn from it, in favour of the conclusive character of this judgment, also fails. Quacunque via data, the district judgment is to be treated as the judgment of a foreign court. Considering it in this light, what are the consequences?
First, it is abuudantly clear that the plea of nil debet is, in this view of the case, the proper plea. The proceedings of a foreign courL are never looked upon as a record, because they have not the force of a record. This position requires neither argument nor authority for its support.
Secondly, it is not so clear whether the second plea, which goes to the merits of the original demand, is a *654 good plea or not. Much difference of opinion prevails as to the weight of a foreign judgment, in the forum of another jurisdiction, whose aid. is sought to enforce it. Until recently, the opinion of'lord Man field, in Walker ^ jymcr^ alK] 0f house of lords in Sinclair v. Fraser, seem to have established that the judgment of a foreign court was prima facie evidence for the plaintiff, but prima facie only : that it was examinable, and that “ the defendartt might impeach the justice of it, or shew that it was irregularly or unduly obtained.” This opinion, however, was not unquestioned. 2 Starkie’s Evid. part 2. p. 20S. 2 Pothier on Obligations, p. 303. Evans’s note. And it has very recently been rejected by vice chancellor Shad well in the case of Martin v. Nicolls, 3 Simons 458. the learned judge declaring that foreign judgments were conclusive in the courts of Great. Britain. Upon examination of the cases, I am of opinion that the weight of authority is with lord Man-field, justice Butter, lord chief justice Eyre and the house of lords, against the doubts of lord Kenyon, the early opinions of lord Nottingham, the “ pithy observation” (as it is called) of lord Ellenborough,* and the reflected opinion of. the vice chancellor. The former opinions have been uniformly followed by the courts of Westminster, as may be seen in the cases already cited from the reports. The doctrine moreover is most reasonable, when properly qualified and understood. I am therefore of opinion that a foreign judgment is not conclusive, but examinable.
How far is it examinable? It must be confessed that in some of the cases the courts have gone a great way in examining into the merits of a foreign judgment. 3 Bing. 353. Bissell v. Briggs, 9 Mass. Rep. 462. opinion of Parsons, chief justice. But I am persuaded *655 this is ffoino- beyond the meaning of the house of lords . ,. V. in Sinclair v. Fraser; lor there it is only declared that the defendant may “impeach the iusticc of the iudgmenf, or shew the same to have been irregularly or uuduly obtained.” Of this opinion chief justice Kent seems to have been, in Taylor v. Bryden, 8 Johns. Rep. 173. decided at a time when the judgments of the sister states were in New York placed upon the footing of foreign judgments. He says, “ The defendant must impeach the judgment by positive proof that it was unduly or irregularly obtained.” He then contests the notion of going into the merits of the original controversy, and trying the cause over again ; and concludes with saying, — “ The general language of the books is, that the defendant must impeach the judgment by shewing affirmatively that it was unjust, by being irregularly or unfairly obtained.” In this opinion I concur; and will only beg leave to read, in support of the objections to opening all the merits of a foreign judgment, the forcible remarks of justice Story in his work on the Conflict of Laws, sect. 607. though I do not admit the conclusivcness of foreign judgments, to which he inclines.
“If is very difficult to perceive what could be done, if a different doctrine were maintainable to the full extent of opening all the evidence and merits of the cause anew, on a suit upon the foreign judgment. Some of the witnesses may be since dead ; some of the vouchers may be lost cr destroyed; the merits, as formerly before the court upon the whole evidence, may have been decidedly in favour of the judgment; upon a partial possession of the evidence they may now appear otherwise. Suppose a case purely sounding in damages, as an action for an assault, for slander, for conversion of property, for a malicious prosecution, for criminal conversation ; is the defendant to be at liberty to retry the whole merits, and to make out, if he can, a new case upon new evidence ? Or is the court to review the for *656 tner decision like a court of appeal upon the old evidence? In case of covenant, or debt, or breach of contract, are all the circumstances to be reexamined anew? And if they are, by which laws and rules of ev¡¿[ence anc] principles of justice is the validity of the original judgment to be tried? Is the court to open the judgment and to proceed cx cequo et bono ? Or is it to administer strict law, and stand to the doctrines of the local administration of justice ? These and many more questions might be put to shew the intrinsic difficulties of the subject. Indeed shewing the judgment to be prima, facie evidence for the plaintiff would be a mere delusion, if the defendant might still question it by opening any of the original merits on his side ; for under such circumstances it would be equivalent to granting a new trial. It can well be understood, that a defendant may be at liberty to impeach the original justice of the judgment, by shewing, that the court had no jurisdiction, or that he never had notice of the suit, or that it was procured by fraud, or that upon its face it is founded in mistake: or that it was irregular, and bad by the local law rei judicatce. To such an extent the doctrine is intelligible and practicable. Beyond this the right to impugn the judgment is in legal effect the right to retry it at large, and to put the defendant upon proving the original merits.”
It is difficult indeed , to imagine how the pleadings are to be made up, if enquiries are permitted as to the merits of the original action. To go to trial (on nil debet to debt on a judgment) of all the complicated defences in. an antecedent action ofcovenant, or of debt on-bond with collateral condition, would seem little calculated to effect the ends of justice: and to perhnit the pleas'of non est factum, covenants performed, release of actions, offsets &c. in answer to a plain action of debt on a judgment,'Would seem equally irreconcilable with the principles of pleading. I conclude therefore that *657 the defendant cannot bring in question the merits of the original judgment; and that the second plea here is naught.
constitutional provision. That would indeed be true, if that rule were both universal and permanent. But we have already seen that in some of the states the merits of a foreign judgment are examinable at large, and the cause is opened as for a new trial. It was therefore wise in the framers of the constitution to insert this provision in that instrument, which, as between the states, secures both uniformity and permanency. It may be said that upon the rule which we have laid down, there could have been no necessity for the
Upon the whole, I am of opinion that the judgment should be reversed, a.nd the plea of nil dcbet admitted; but that the other plea was properly rejected.
Brooke, J. concurred. Judgment reversed.

 Note by the judge. The late judge While, whose profound legal knowledge is universally admitted, decided, in the case of Hush v. M’Ca,Ulster, that the judgment of the federal circuit court for the district of North Carolina was conclusive in a Virginia court; but in the subsequent case of Lee v. Hopkins (Frederick superiour court) ho decided that a judgment of the district of Columbia was not conclusive, and admitted the plea of nil debet. These opinions I have seen.

Pepoon v. Jenkins, 2 Johns. Ca. 119. was cited to this point, but it is wholly inapplicable. Note by the president.

 4 Maule & Sel. 20. The case did not involve this principle. It was more like the cases of Buford v. Buford, 4 Munf. 241, and Ray v. Clemens, 6 Leigh 600. — Note by the president.